352 So.2d 275 (1977)
G. T. BLACKSHERE, Plaintiff-Appellant-Appellee,
v.
KEMPER INSURANCE COMPANY, Hughes Oxygen Company, Inc. and Union Carbide Corporation, Defendants-Appellants-Appellees.
No. 13367.
Court of Appeal of Louisiana, Second Circuit.
October 31, 1977.
Rehearing Denied December 5, 1977.
*276 Gamm, Greenberg & Kaplan by Irving M. Greenberg, Shreveport, for plaintiff-appellant-appellee, G. T. Blackshere.
Bodenheimer, Jones, Klotz & Simmons by G. M. Bodenheimer, Jr., James P. Bodenheimer, Shreveport, for defendants-appellants-appellees, Union Carbide Corp. and American Motorists Ins. Co.
Cook, Clark, Egan, Yancey & King by Gordon E. Rountree, Shreveport, for intervenor-appellant-appellee, Reliance Ins. Co.
Lunn, Irion, Switzer, Johnson & Salley by Richard H. Switzer, Shreveport, for defendant-appellee, Hughes Oxygen Co., Inc.
En Banc. Rehearing Denied December 5, 1977.
*277 HALL, Judge.
Plaintiff, G. T. Blackshere, an employee of Williams Truck Parts, Inc., was injured when a valve stem assembly blew out of an oxygen cylinder while he was in the process of changing to a full tank in the course of his work with a cutting torch. A portion of the metal handwheel of the cylinder valve passed through his right hand causing him to sustain a severe and permanently disabling injury to the hand. Plaintiff brought suit in tort to recover damages for pain and suffering, permanent disability, loss of earnings and medical expenses. The viable defendants at the time of trial and on appeal are (1) Union Carbide Corporation, manufacturer, owner and lessor of the cylinder and its component valve; (2) American Motorists Insurance Company, Union Carbide's liability insurer; and (3) Hughes Oxygen Company, Inc., distributor of Union Carbide products who leased the tank, inspected it, filled it with oxygen and sold the oxygen in the tank for commercial use. Reliance Insurance Company, the workmen's compensation insurer of Williams Truck Parts, Inc., intervened seeking reimbursement for workmen's compensation benefits paid to plaintiff.
After trial the district court, accepting the theory of Hughes' expert witness as being the most plausible explanation of the cause of the accident, found the cause of the accident was worn and defective threads on the valve stem assembly, which allowed the valve stem assembly to be ejected by pressure from within the cylinder. Further finding that the condition of the valve was the responsibility of Union Carbide and that Hughes Oxygen did not have an opportunity to inspect or know of the condition of the valve stem assembly, the district court rendered judgment in favor of the plaintiff for $47,350 against Union Carbide and its liability insurer, including $14,521.20 due intervenor for compensation benefits paid to plaintiff. Plaintiff's demands against Hughes Oxygen were rejected.
Plaintiff and intervenor appealed asking that Hughes Oxygen be cast in solido with Union Carbide. Plaintiff also asks for an increase in the amount awarded. Union Carbide appealed seeking reversal of the judgment against it; alternatively, seeking to have Hughes Oxygen cast in solido with it; and seeking reduction of the expert witness fees awarded. For reasons set forth in this opinion, we affirm the judgment against Union Carbide, reverse the judgment rejecting plaintiff's demands against Hughes Oxygen, render judgment against Hughes Oxygen in solido with Union Carbide, increase the amount awarded to $59,000, and affirm the amounts of the expert witness fees.
On July 17, 1972, plaintiff was engaged in his principal duty of cutting metal parts from automobile and truck bodies, requiring the use of a cutting torch which operated off of a cylinder of compressed oxygen. The oxygen cylinder being used by plaintiff became empty. A co-employee, Harvey Thomas, went to Shreveport Iron & Supply Company, which purchased oxygen from Hughes Oxygen for its own use and for resale to Williams Truck Parts, Inc., and returned about 15 minutes later with a full cylinder in the back of his pickup truck. Plaintiff removed the full cylinder and placed it on the bed of another pickup truck used in connection with the torch operation. He then began to attach the regulator which had been removed from the expended cylinder to the valve body on the full cylinder. He hand-tightened the nut by which the regulator attached to the valve. As he reached for a wrench to further tighten the nut, an explosion occurred and the valve stem assembly was violently ejected from the valve body. Parts of the handwheel punctured plaintiff's hand.
Both plaintiff and Thomas testified to observing a "dark oily substance" spewing or "bubbling" from the valve and spraying over the bed and back of the cab of the truck. Other witnesses observed the dark substance on the truck immediately after the accident. A dark substance was observed on plaintiff's hand by the doctor who treated him. Both plaintiff and Thomas testified that at no time did either of them *278 open the valve. The evidence establishes that the procedure employed by plaintiff was the normal and proper procedure for using compressed oxygen and for attaching the regulator and torch equipment to the valve of the oxygen cylinder.
The ejected valve stem assembly and parts of the broken metal handwheel were found in the bed of the pickup truck after the accident. These parts and the cylinder and valve body were preserved, examined by the experts, and offered into evidence.
The cylinder or tank was manufactured by Union Carbide in 1920. The valve, including the component valve stem assembly, was manufactured by Union Carbide in 1948. Under federal regulations at the time, Union Carbide was required to inspect the equipment at least every five years. The tank bore a stamp which showed that it was last inspected by Union Carbide in December, 1970, approximately two years prior to the accident. The tank and valve were owned by Union Carbide at the time of the accident.
Under a written contract Hughes Oxygen was a distributor of Union Carbide products. A large number of oxygen tanks were leased by Union Carbide to Hughes Oxygen for a monthly rental. Under the contract Hughes had the responsibility for inspecting and maintaining the cylinders and valves, as well as filling the tanks with oxygen and selling the oxygen in the tanks for commercial use. Valve replacement parts were furnished to Hughes as required at no charge. Pursuant to this arrangement, Hughes, from time to time, repaired and replaced valves or valve parts. From time to time, upon discovering defects in the cylinders or valves, Hughes returned the cylinders and valves to Union Carbide for repair or replacement.
Union Carbide also leased to Hughes the equipment required for filling the tanks with compressed oxygen, transformed from liquid oxygen sold by Union Carbide to Hughes.
The inspection and filling procedure employed by Hughes was prescribed by Union Carbide. The procedure consisted of:
(1) Visual inspection of the cylinder, valve and threads by a pumper for dents, cracks or bends, foreign substances or any other visual defects;
(2) A hammer test consisting of the pumper hitting the cylinder with a small hammer, with a thud indicating the presence of a foreign substance and a ring indicating an empty cylinder;
(3) An odor test in which the pumper opens the valve and sniffs the exhausting gas. Since oxygen is odorless, any odor would indicate the presence of a foreign substance;
(4) Placing of the cylinders on the charging rack at which time any gas still present in the cylinders is pulled from them with a vacuum pump;
(5) Filling the cylinders with oxygen to a pressure of 2200 pounds per square inch, measured by various gauges and regulators; and
(6) A soap test in which soap is applied to the valve to check for leaks which are disclosed by a bubbling of the soap around the valve.
The evidence establishes these procedures were regularly followed by Hughes. The cylinder involved in this accident bore a label stating that it had been inspected and filled by Hughes Oxygen Company. There is no evidence that the cylinder or valve was misused or abused in any respect after it left the hands of Hughes.
Three expert engineering witnesses testified at the trial. Richard L. Madison of Haag Engineering Company in Dallas was employed by intervenor and testified on behalf of intervenor and plaintiff. He examined the cylinder, valve and components and talked to the plaintiff, Thomas, and other witnesses shortly after the accident. Madison theorized that the explosion was caused by an overpressurization in the cylinder tank probably caused by a reaction between the oxygen and a foreign substance such as oil or other hydrocarbon which was present in the cylinder itself. Madison observed that the male and female *279 threads by which the valve stem assembly connected to the valve body were damaged, which damage was caused principally by the explosion, but which could have existed to some extent prior to the explosion. He concluded that the threads on the valve stem were weaker than the tank, thereby allowing the ejection of the valve stem by the explosion.
Robert M. Neary, an experienced engineer employed by Union Carbide, testified on behalf of his employer. Neary attributed the cause of the accident to the presence of hydrocarbons on the regulator. He was of the opinion that plaintiff must have opened the cylinder valve prior to the explosion which allowed a movement of gas into the regulator and caused an explosion in the regulator which moved into the top of the main cylinder and then blew the valve stem out under the extreme pressure being exerted.
Leonidas L. Denson of Denson Engineers, Inc., in New Orleans testified on behalf of Hughes Oxygen. His findings, which were adopted by the trial court, were that the explosion occurred because of defective threads on the valve stem assembly. It was his opinion that the five threads on the valve stem assembly were inadequate in view of the federal requirements that connections to the tank must have at least six threads. He was further of the opinion that the threads were in a defective condition due to wear and tear prior to the accident and that this condition should have been discovered by Union Carbide in their 1970 inspection. Denson believed that the valve stem assembly, in its defective condition, was ejected by the normal pressure contained in the tank and that the explosion occurred almost simultaneously thereafter when gas was allowed to move into the regulator. Denson was of the opinion the valve must have been opened prior to the ejection of the valve stem assembly in order for enough force to have been exerted on the assembly by the normal pressure in the cylinder.
None of the experts performed any metallurgical tests on the valve parts. The conclusions of the experts were based primarily on visual inspection, some experiments with similar parts, their knowledge of the supposed strength of the different components, and reconstruction based on their knowledge, expertise, and experience. Each of the three theories has substantial deficiencies. For example, Neary's theory is based on the premise that the valve was opened allowing oxygen to come into the regulator under high pressure. (Neary also opined that the oxygen could have come into the regulator by bleeding back through the hoses leading to the cutting torch but he advanced this alternative theory without much conviction). The evidence is convincing, however, that the valve was not opened by Blackshere or Thomas. Neary's theory also does not account for the well-established fact that a black, oily substance spewed out of the valve in substantial quantity at the time of the explosion. Denson's theory that the valve stem assembly ejected under normal pressure prior to the explosion also depends on the valve being opened. With the valve closed it is improbable that enough force could be exerted through the small opening from the cylinder to the seat of the valve stem assembly to cause its ejection, even in a weakened condition. The significance of five versus six threads on the connection is not established. Denson's theory also does not account for the presence of the black, oily substance. Madison's theory is weakened by the fact that an explosion within the cylinder of a magnitude sufficient to eject the valve stem assembly, if in good condition, and to cause the damage done to the regulator would have also caused the tank itself to explode.
Although the precise origin, cause, nature and magnitude of the explosion may not be discernible from the evidence in this record, a number of facts can be said to be solidly established:
(1) The cylinder and valve were being put to normal use by plaintiff in the manner for which they were intended at the time of the accident;
(2) The valve had not been opened by plaintiff or his co-employee;
*280 (3) There was an explosion and the valve stem assembly was forcibly ejected from the valve body, causing plaintiff's injury;
(4) There was a foreign substance within the cylinder and/or valve in a significant quantity which was spewed from the valve at the time of the explosion and which was probably oil or a similar hydrocarbon;
(5) The explosion was caused by a reaction between the compressed oxygen and a foreign substance such as a hydrocarbon; and
(6) The threads on the valve stem assembly were weak and defective prior to the accident allowing the assembly to be ejected by a force less than that which would have been required to cause its ejection if it had been in proper condition.
It is reasonable to conclude, and this court does conclude, that the presence of a quantity of hydrocarbon in the valve or cylinder and the defective threads on the assembly connection were both significant contributing causes of the forcible ejection of the assembly and the resulting injury to plaintiff's hand.
Those who deal in or handle dangerous substances or agencies such as explosives, electricity, gas, firearms, combustibles, and fireworks are held to an extraordinary degree of care. Royal Insurance Company v. Fidelity and Casualty Company of New York, 256 So.2d 352 (La.App. 1st Cir. 1971) and cases cited therein. Compressed oxygen is an explosive and is an ultrahazardous and dangerous substance or agency.
The doctrine of res ipsa loquitur is applicable in this case. See Hake v. Air Reduction Sales Co., 210 La. 810, 28 So.2d 441 (1946). The facts of this case suggest that the negligence of defendants, rather than some other fact or factors, is the most plausible explanation of the accident. Boudreaux v. American Insurance Company, 262 La. 721, 264 So.2d 621 (1972). The evidence creates an inference of negligence on the part of defendants. King v. King, 253 La. 270, 217 So.2d 395 (1968); Alexander v. St. Paul Fire and Marine Insurance Company, 312 So.2d 139 (La.App. 1st Cir. 1975), writ refused, La., 313 So.3d 846 (1975). In certain types of cases involving certain types of accidents, exclusive possession and control by the defendant is not a prerequisite to application of res ipsa loquitur. When proof is made of freedom of fault on the part of those through whose hands the instrumentality passed after it left the hands of the defendants, as in the present case, negligence of the defendant is inferred from the happening of the accident and to escape liability it must overcome the inference. This principle has been applied in cases similar to the present case. See Plunkett v. United Electric Service, 214 La. 145, 36 So.2d 704 (1948); Hake v. Air Reduction Sales Co., supra; and cases cited therein.
Res ipsa loquitur applies equally to each of the defendants in this case and creates an inference of negligence on the part of each. Each defendant had joint continuing control over and responsibility for the condition of the cylinder valve. Union Carbide was the manufacturer, owner and lessor of the cylinder and valve. It was required by federal regulations and did, in fact, make periodic inspections of the equipment. The equipment was used in furtherance of Union Carbide's business. Union Carbide furnished replacement parts and contractually required its distributor to maintain and inspect the valves and prescribed procedures to be followed in this respect. Hughes contractually undertook the responsibility for inspecting and maintaining the equipment and actually performed inspection and maintenance procedures. It furnished the equipment to consumers in furtherance of its business, with the equipment marked "Inspected and filled by Hughes Oxygen Company".
The inference of negligence was not effectively overcome by either defendant. While there is evidence that Hughes routinely performed inspection procedures in connection with the filling of all cylinders, there is no evidence of what was done in connection with this cylinder and valve specifically. Assuming that the routine inspection procedures were followed in connection *281 with this cylinder and valve, it necessarily must be concluded because of the existence of the defect and its nondetection that the inspection was inadequately performed or that the procedure itself was inadequate. The valve involved in this case was 24 years old although the evidence does not show how long it had actually been in use. It stands to reason that metal parts will deteriorate or wear out, as demonstrated by the evidence that Hughes and Union Carbide from time to time had to repair and replace parts. Worn and weak threads can be and should have been detected by careful inspection. It offers Hughes no protection from legal responsibility for the condition of the valve to say that its normal inspection procedure did not include an inspection of the internal components of the valve.
Further dealing with Hughes' responsibility, the presence of the foreign substance in the cylinder or valve, which we have held to be a contributing cause of the accident, necessarily resulted from inadequate or improper inspection and filling by Hughes.
Union Carbide and Hughes are solidarily liable to the plaintiff for his damages sustained by reason of their joint negligence.
The trial court awarded plaintiff $47,350 itemized as follows:

Past and future loss of earnings $28,350
Past and future pain and suffering 6,500
Permanent disability 8,300
Past and future medical expenses 4,200
 _______
 Total $47,350

Plaintiff seeks substantial increases in the amounts awarded for past and future loss of earnings and for pain, suffering and disability.
The injury to the hand was severe, painful and disabling. Plaintiff was in the hospital several days. His treatment extended over many months and included two operations. He continues to have some pain in his hand and has restriction and limitation of movement of his fingers, particularly the middle and ring fingers. Plaintiff can no longer use a cutting torch or similar equipment and cannot do any type of work causing pressure to the palm of his right hand or requiring gripping of tools or other implements.
Plaintiff was 46 years old at the time of the accident. He had done farm work during most of his adult life but during the previous eight or nine years had worked at various common labor jobs. Plaintiff learned to use a cutting torch and had worked regularly for Williams Truck Parts for several months, earning $1.75 per hour, slightly over the then minimum wage of $1.60 per hour. His wages the last two quarters he worked exceeded $900 per quarter. Considering plaintiff's age, intelligence and capabilities, it is highly unlikely that he could learn new skills which would enable him to do work that does not require the use of his hands. In the several years between the date of the accident and date of trial the only work done by plaintiff was a few odd jobs for a cousin. He is totally and permanently disabled from obtaining regular, gainful employment even at minimum wage.
The award of $14,800 for pain, suffering and disability is conservative but is within the range of the trial court's discretion. The evidence, however, compels an increase in the amount awarded for past and future loss of earnings. At the time of trial in the latter part of 1976, approximately four and one-half years after the accident, plaintiff had lost some $16,200 in wages based on his earnings at the time of the accident of approximately $3,600 per year. Assuming 15 more years of work life expectancy at the same wages, future loss of earnings would be $54,000. These figures do not take into account increases in minimum wage which have already taken place and which will take place in the future, nor is inflation taken into account. Even if it is assumed that plaintiff will be able to earn some occasional or part-time wages in the future and even if the future loss of wages is discounted, the award for past and future loss of earnings must be at least the $40,000 amount prayed for in plaintiff's petition. This award will be increased from $28,350 to $40,000.
*282 Union Carbide and its insurer complain of awards made for the fees of two of the expert witnesses in the amounts of $2,185.83 for Madison and $4,520.19 for Denson. The fee awarded for Madison is supported by an itemized statement of his services and expenses in the record and does not appear to be out of line. We find nothing in the record either supporting or refuting the fee awarded for Denson and there is no basis for a review of that award by this court. The amount does not of itself indicate an abuse of the trial court's discretion. The awards for expert witness fees will be affirmed.
For the reasons assigned, the judgment of the district court is affirmed in part, reversed in part, amended, and recast as follows:
It is ordered, adjudged and decreed that there be judgment herein in favor of plaintiff, G. T. Blackshere, against Union Carbide Corporation and American Motorists Insurance Company and against Hughes Oxygen Company, in solido, in the amount of $59,000, together with legal interest thereon from date of judicial demand until paid and for all costs of these proceedings.
It is further ordered, adjudged and decreed that there be judgment in favor of intervenor, Reliance Insurance Company against defendants Union Carbide Corporation and American Motorists Insurance Company, and against defendant, Hughes Oxygen Company, in solido, in the full sum of $14,521.20, which sum is for workmen's compensation and medical expenses paid to and in behalf of plaintiff by Reliance Insurance Company up to and including January 7, 1977. In addition, there is a judgment herein in favor of Reliance Insurance Company against Union Carbide Corporation and American Motorists Insurance Company, and against Hughes Oxygen Company, in solido, for any additional workmen's compensation payments made to plaintiff from January 7, 1977, up to and including the date that this judgment is paid in full. Reliance Insurance Company is further entitled to judgment for legal interest from date of judicial demand or date of payment, whichever is later, until paid.
The above said monies awarded Reliance Insurance Company are included within the described sum of $59,000 awarded to plaintiff and such sums will be paid with preference and priority to Reliance Insurance Company out of the said $59,000 and further, in view of the fact that said $59,000 judgment is greater than the amount due to Reliance Insurance Company, pursuant to LSA-R.S. 23:1103, upon payment of the excess to the plaintiff, the liability of Reliance Insurance Company for compensation shall cease for such part of the compensation due computed at 6% per annum and shall be satisfied by said excess payment.
It is further ordered, adjudged and decreed that the said expert witness fees are taxed as costs of this suit and Union Carbide Corporation and American Motorists Insurance Company and Hughes Oxygen Company, in solido, shall bear all costs of this suit. The expert witness fee of Richard L. Madison, plaintiff's expert, is hereby fixed at $2,185.83. The expert witness fee of Dr. C. G. McAllister is hereby fixed at $125. The expert witness fee of Leonidas L. Denson, expert for Hughes Oxygen Company, is hereby fixed at $4,520.19.