BOUTALL, Judge.
This case concerns a gas explosion in a residential neighborhood in uptown New Orleans which resulted in personal injuries and property damages.
On or about February 7, 1978, a pipeline, owned by New Orleans Public Service, Inc. (hereinafter referred to as NOPSI), running underneath the 2100 block of Burdette St. in uptown New Orleans began leaking gas which spread to several residences located *1264 on that street. Shortly thereafter, this gas ignited and these residences were engulfed by flames, thereby inflicting serious property damages and minor personal injuries upon those occupying the residences at that time. This incident spawned numerous suits filed by property owners and those individuals who suffered personal injuries, all of which were consolidated for trial. Of the twelve different suits that were filed, eight were settled prior to trial. The four remaining claims were as follows: 1.) William Claycomb vs. NOPSI and the Sewerage & Water Board of New Orleans (hereinafter referred to as S & WB) for alleged personal injuries and property damages sustained while occupying the premises located at 2121 Burdette St.; 2.) Mabel Wilson vs. NOPSI for personal injuries sustained while occupying her home on Burdette St.; 3.) Adrian and Bonnie Berry, individually and on behalf of their minor child Shannon Berry vs. NOPSI and the Sewerage and Water Board for property damages and personal injuries sustained by Shannon Berry who was occupying the premises located at 2119 Burdette St. at the time of the explosion, and for a loss of wages sustained by Bonnie Berry; 4.) Doris Clinton vs. NOPSI and the Sewerage & Water Board for personal injuries and property damages sustained while occupying the premises located at 2119 Bur-dette St. Both NOPSI and the S & WB denied any liability for the alleged personal injuries and property damages allegedly sustained by the above plaintiffs.
In the first two suits above NOPSI filed a third party demand against the S & WB seeking indemnity or contribution for any award of damages for which it may be held liable unto the named plaintiffs. During trial of this matter the lower court granted a Directed Verdict in favor of the Sewerage & Water Board thereby absolving it from liability of any kind. Regarding the defendant NOPSI, the jury returned a verdict finding it liable unto the various plaintiffs as follows: 1.) Claycomb was awarded $60,-000; 2.) Wilson was awarded $515; 3.) Adrian and Bonnie Berry individually were awarded $5,000; 4.) Adrian and Bonnie Berry on behalf of their minor daughter Shannon Berry were awarded $5,000; 5.) Clinton was awarded $87,820. Both the Berrys and NOPSI have appealed devolutively.
On appeal the issues before us are as follows: 1.) Whether the trial court committed error in granting a directed verdict in favor of the Sewerage & Water Board absolving it from any liability unto NOPSI; 2.) whether the trial court properly assessed the award of damages made to Adrian and Bonnie Berry individually and on behalf of their minor child Shannon for their alleged property damages and personal injuries; 3.) whether the trial court properly assessed the costs against the defendant NOPSI in connection with both the claims settled pri- or to trial and those claims for which trial was held.
DIRECTED VERDICT
The trial of this case was bifurcated, that is, the suits of the various plaintiffs against the defendant NOPSI were being tried before a jury, while the claims of the original plaintiffs and the third party claim of NOP-SI against the Sewerage and Water Board was being tried simultaneously before the judge.
It is NOPSI’s theory of the case that the liability of S & WB is based upon the following: Three feet below the pavement of the 2100 block of Burdette Street, NOPSI owned and maintained a 16 inch intermediate gas pipe line. It is conceded that this line ruptured, causing natural gas to spread under the street, sidewalk and front lawns in the area. The gas was ignited by an unknown source, causing explosions and fire resulting in the damages sued upon. Parallel to NOPSI’s line, at a distance of 4 feet, 9 inches on center and slightly lower is a 13 inch drainage pipe line owned and maintained by S & WB. It is contended that the bell and spigot joints in the drainage line leaked, causing the surrounding soil to be leached out and creating a void. This void caused some sideways movement of the gas line and the stress caused the gas line to crack. As a result the gas flowed through the void into the leaky drainage *1265 line and was thus spread throughout the area.
At the conclusion of the evidence offered by the original plaintiffs and by NOPSI, S & WB moved the judge for a directed verdict in accordance with Code of Civil Procedure Article 1810 B, which reads in pertinent part as follows:
“B. In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the evidence.”
The trial granted the directed verdict and rendered judgment in favor of the Sewerage & Water Board on the basis that all plaintiffs and third party plaintiffs had failed to offer any evidence showing that the Sewerage & Water Board had notice of defects, either active or constructive. We have examined the record and the factual finding of the trial judge is correct, i. e., that there is not evidence of notice of any defects to the Sewerage & Water Board. However, the issue on appeal as to the correctness of the ruling is not one of fact in this regard, but rather one of law.
NOPSI reasons that its liability was based upon the doctrine of strict liability imposed upon an owner or custodian for damages caused by things in its custody, its pipe line, under the provisions of Louisiana Civil Code Article 2317 and the case of Loescher v. Parr, 324 So.2d 441 (La.1975). Correspondingly, it contends that this same doctrine of strict liability should apply to S & WB as the owner and custodian of its drainage line, allegedly the cause of the gas line break. The trial judge rendered his directed verdict based on the lack of notice of the defect given to the public body. Since the time of that decree, the Supreme Court of Louisiana has rendered a decision in the case of Jones v. City of Baton Rouge, 388 So.2d 737 (La.1980) which eliminated the requirement of notice in cases applying the strict liability doctrine of Article 2317. Thus NOPSI urges that the trial judge erred.
We agree that Jones v. City of Baton Rouge has removed the requirement of notice to public bodies in eases in which the principles of Article 2317 apply. However, that court did not intend that notice of the defect be eliminated as a defense in every case. The court stated, 388 So.2d 740:
“***** Proof of notice of the defect is indeed required when a plaintiff contends that a public body was negligent, either by virtue of specific conduct of its employees which created the dangerous situation (which is itself construed as notice), or by virtue of its failure to correct a dangerous condition caused by others. But, as we have demonstrated, negligence is only one of the footings on which the codal structure of tort liability rests. Where delictual responsibility is based not on negligence but on legal fault, under article 2317, a public body’s knowledge of the existence of the danger is irrelevant. Liability is a consequence of the fact of ownership and custody in itself, not of the breach of a duty.”
A consideration of the cases of Jones v. City of Baton Rouge and Loescher v. Parr leads us into a somewhat paradoxical situation. NOPSI’s demands against S & WB for relief are couched in two fashions, one in the nature of indemnity because the damages were due solely to S & WB’s fault, and the other in the nature of contribution as a joint debtor or tort feasor. Because it is apparent in this case that NOPSI’s liability was assessed under Article 2317, NOPSI, as the custodian, can escape liability only by showing that the harm was caused by the fault of the victim, by the fault of a third person or by an irresistible force. Since the issue here is only between NOPSI and S & WB it follows that NOPSI’s claim of indemnity must necessarily be based upon the fault of a third person, i. e., S & WB. By *1266 definition a case under Article 2317 does not have the element of fault proven against a defendant owner and thus it would seem that a case of negligence under 2315 is presented, in which notice would still be required. Based upon that proposition, the trial judge’s directed verdict based upon lack of notice is correct in disposing of that aspect of the case.
Such a concept does not require the dismissal of all of NOPSI’s claims against S & WB. NOPSI asks for contribution from S & WB and we see no reason why joint liability could not be obtained in a case by injured plaintiffs against two owners in sol-ido under Article 2317, whose defective things caused the damages complained of. Under this proposition, the question of notice does not arise and instead of fault under Article 2315, there must be proof of the elements necessary to recovery under Article 2317. In Jones v. City of Baton Rouge, it is pointed out that no particular act or omission on the part of the defendant caused the injuries, but instead the injured party must prove three things: that the thing which caused the damage was in the care or custody of the defendant, that the thing had a vice or a defect — that is, that it occasioned an unreasonable risk of injury to another — and that his injury was caused by the defect.
With these principles in mind, we call attention again to the procedural situation here, that this appeal arises out of the directed verdict and not out of the final submission of the case on the merits. Because the trial judge’s reasons for the directed verdict did not dispose of all of the issues between the parties, it may be that we should remand this matter to the District Court for completion of the case in order to grant the defendant S & WB an opportunity to present its evidence in defense. Nevertheless, we are constrained by our Supreme Court in the case of Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975) to decide the issues appropriate from the record before us in the interest of judicial economy and disposition of litigation. Additionally, C.C.P. Article 2164 provides that we shall render any judgment which is just, legal and proper upon the record on appeal. Accordingly, we have considered the record to determine whether the directed verdict might also be justified in disposing of all of the issues between NOPSI and S & WB. S & WB offered several reasons for the directed verdict, including lack of vice or defect and causation of injury by defect, none of which were mentioned by the trial judge in his reasons for judgment, but which were certainly before him for consideration. C.C.P. Article 1810. These issues have been raised before us on appeal.
Because the issue of the liability of S & WB was being tried before the judge and not before the jury, the standard for consideration of the evidence upon which to base a decision as to what facts are proven is the standard of preponderance of evidence. Sevin v. Shape Spa for Health and Beauty, Inc., 384 So.2d 1011 (La.App.4th Cir. 1980); Gleason v. City of Shreveport, 393 So.2d 827 (La.App.2d Cir. 1981). In order to impose liability on S & WB in this case, it is necessary that NOPSI show by a preponderance of the evidence that there was a defect in S & WB’s drainage line, and that that defect caused the injuries complained of.
As previously indicated, this matter concerns a natural gas explosion caused by gas leaking from one of NOPSI’s pipe lines beneath Burdette Street in uptown New Orleans. The various structures that were damaged as a result of the fire were on the downtown or odd numbered side of the 2100 block of Burdette. Beneath Burdette Street are a number of other service lines, but the pipe lines mainly involved here are three in number. The first of these is NOPSI’s 16 inch intermediate gas cast iron pipe line which is located about three feet beneath the middle of Burdette St. Approximately 1 and V2 feet away on the downtown side is a 6 inch utilization pressure gas pipeline owned by NOPSI. The third pipeline is the Sewerage & Water Board drainage line which is located 4 feet 9 inches away on the downtown side and slightly lower. It is established beyond doubt that the natural gas escaped from a *1267 crack in the 16 inch intermediate pipe line, spread throughout the area, and was ignited by an unknown source, resulting in explosion and fire. Our inquiry here is concerned only with the proof that a defect in the S & WB drainage pipeline caused the NOPSI gas line to crack and whether the defect caused the gas to spread and be ignited.
After the initial explosion and resulting fire, the NOPSI gas pipeline was closed off, and excavation in the street began to determine the source of the gas. It was discovered that there was a crack in the gas line at a corroded area, and excavation continued to make room for repair. This resulted in two findings, one that the gas pipeline was completely broken, and two that there was a void or hole existing between the gas pipeline and S & WB’s drainage line, the exact location and extent thereof being in dispute.
The existence of this void is one of the focal issues in this case, because NOPSI contends that the void caused its pipeline to shift and thus break, and that the resulting gas flow entered this void and then S & WB’s drainage line spreading throughout the area. It should be noted of course that this void is beneath the city street and of course is not under the exclusive control of the S & WB. Both NOPSI and S & WB have authority to install and maintain pipelines beneath the city street, although by ordinance the city has granted S & WB priority rights for its pipelines. It should also be noted that the uncontradicted testimony is that there are numerous voids beneath the streets of New Orleans, being of various sizes and caused from various reasons, but they are common things and their existence is well known to the parties here involved. Indeed it is expected that beneath most of the paved streets in New Orleans because of soil subsidence and other problems, there are generally numerous empty spaces between the pavement of the street and the foundation upon which the street is built.
We first address the causal relationship of the void to the rupture of NOPSI’s gas line. Although the void is in an area not under the exclusive control of S & WB, nevertheless, the testimony is unrefuted that there was a leakage in the drainage line and this caused a leaching or removal of the soil creating the void. (This being on directed verdict, S & WB has not yet presented its defense.) Because of the stresses and pressure that occur in a gas pipeline, it must be rigidly held in place to prevent its rupture. Although NOPSI has shown that there is a possibility that the existence of this void caused a rupture of its pipeline in this area, we cannot say that it is more probable than not that the rupture was caused by the void, nor conclude that NOPSI has borne the burden of showing that fact by a preponderance of the evidence. We reach this conclusion for a number of reasons.
First, although there is a dispute as to the location and size of the void, the testimony is unanimous that there was solid clay surrounding the broken pipeline, and there was no disturbance of the area which would indicate that the pipeline had moved towards the void. Secondly, although there is a dispute between the experts offered by plaintiffs to show causation, it is unanimous that there was a large area of corrosion or graphitization of the pipeline in the area where it ruptured. Graphitization is described as a sort of corrosion or change in the basic composition of a cast iron pipeline such that the strength of the iron content is removed and the weaker graphite structure is left. It is quite significant that this area was located on the opposite side of the pipeline from the void. The evidence fairly shows that the initial break took place in this area and that the whole pipeline then ruptured. The normal way in which a pipeline would rupture when exposed to a void would be to first break on that side closest to the void which would obviously have the most stress. NOPSI would have us believe that this pipeline reacted in the opposite fashion. Considering the testimony of the experts in this regard, we must point out that the initial report of NOPSI’s expert was changed in several significant ways to accommodate NOPSI’s theory.
*1268 Finally, on this issue we refer to the condition of NOPSI’s pipeline itself. Such cast iron pipelines are no longer used but have been replaced in the industry by steel pipelines which are considerably stronger and not subject to graphitization. While the testimony is that a cast iron pipeline may last indefinitely, the pipeline had been installed fifty years previously and of course has been exposed to graphitization for a long period of time. NOPSI’s original explanation for the rupture of its line was that it was caused by thermal stress, manufacturing faults, or material failure of the pipe. The fact that other causes than the void may have triggered this rupture is quite obviously demonstrated by the fact that just four days previously, this same pipeline had ruptured in the 2300 block of Burdette Street, just two blocks away, and it is conceded that there was no void in that area to cause such a break.
Accordingly, based upon the facts discussed above, we conclude that NOPSI has not shown by a preponderance of the evidence that the void caused the break in question. Similarly, we conclude that NOP-SI has not shown by a preponderance of the evidence that the cause of the widespread distribution of the gas was the void and entry into the drainage line.
As to this issue of course it must be readily conceded that a drainage line by its nature is open to necessarily receive the drainage waters and is not designed to protect against the entry of gases to which it may be exposed. We cannot conclude that S & WB owes a duty to NOPSI or even to the residents of the area to construct a drainage line impervious to the entry of natural gas, and indeed no theory is advanced to us as to how such an effective drainage line may be constructed. NOPSI’s basic contention is that the gas from its ruptured pipeline went through the void and entered a crack in the drainage line and continued through the drainage line or along connecting voids spreading throughout the area. This theory is disposed of by the testimony of the witnesses to the fire who testified that there was fire throughout the entire area: Fire coming from cracks in the street, from along the sidewalk, from along the front yards, from the open drainage inlets, and even from the telephone line manholes. Considering the evidence concerning the voids beneath paved streets in New Orleans, their testimony shows precisely the type of spreading that would take place from a ruptured gas line beneath a paved street. Those witnesses who saw the fire in its initial stages testified as to their observation in certain areas that the fire seemed to run along NOPSI’s gas line and explode by the gas meter and then return out to the street where fire began in the drainage inlet. Similarly, the evidence shows that the drainage lines were not so constructed as to bring the gas into a house where it may be exposed to sparks causing it to explode, nor were the lines laid to conform to the pattern of spread of the fire as testified to by the witnesses.
Accordingly, we conclude that the trial judge was correct in entering a directed verdict.
II
The next issue for our consideration concerns the validity of the award of damages made to Adrian and Bonnie Berry on behalf of their minor daughter Shannon and the award made to the Berrys individually. For the sake of clarity and an ease of understanding each award will be considered individually.
On the night of February 7, 1978, Shannon Berry, age 3, was visiting with her grandmother Mrs. Doris Clinton at the latter’s residence located at 2119 Burdette St. In the early evening hours Mrs. Clinton heard a hissing noise outside of her home. She opened the curtains in her living room to determine the source of the noise whereupon she discovered flames of fire in the street. Shortly thereafter an explosion occurred causing damage to her living room area. Alarmed, Mrs. Clinton then grabbed Shannon and carried her to the back of the house. After her pleas for help were unanswered, Mrs. Clinton tossed Shannon out of *1269 a window and onto an outdoor shed some 3 to 4 feet away. Mrs. Clinton followed Shannon and also jumped onto the shed. Shortly thereafter, both of them were rescued by firemen and taken to a neighbor’s home nearby. Shannon was examined later that night by Dr. Edward Abernathy who indicated that Shannon had suffered some smoke inhalation as well as numerous bruises on her right hip and knee and both hands. Dr. Abernathy further indicated that Shannon was scared and clung tightly to her mother. He recommended that she be treated by a pediatrician.
Shannon’s mother, Mrs. Berry testified that Shannon’s personality changed in that she was no longer friendly and outgoing. Shannon became more anxious about things and often clung to her mother. Mrs. Berry further testified that Shannon often became frightened by things which resembled the fire such as the flames from a barbecue pit or a stove. The seriousness of her condition as described by her mother is discounted to some degree by the fact that Mrs. Berry ignored Dr. Abernathy’s recommendation that Shannon visit a pediatrician until some 7 months after the accident. Moreover, Shannon was subsequently treated by Dr. Haslett, a child psychologist in September of 1978-November of 1978, but this doctor was not called to testify so as to verify Shannon’s condition.
Some 2 months prior to trial, in February 1979 or 1 year after the accident, Shannon was sent to Dr. Kleibert Jones, a child psychologist, for examination. Dr. Jones described her condition as an adjustment reaction to childhood which in laymen’s terms means that Shannon had experienced a major life stress in the form of the explosion and fire subsequent to which she developed symptoms relating thereto. He further indicated that Shannon’s day to day functions were not incapacitating, but they were nevertheless affected. Dr. Jones gave the following prognosis: The condition experienced by Shannon was temporary; this condition would probably not develop into a traumatic neurosis, but nevertheless this was a possibility; and Shannon’s condition should gradually improve.
The Berrys contend that the award of $5,000 made by the jury for the personal injuries sustained by their minor daughter Shannon was low and should be increased. Based on the evidence presented at trial we conclude that the award was not manifestly erroneous and did not constitute an abuse of discretion. Reek v. Stevens, 373 So.2d 498 (La.1979).
One final point for consideration here concerns the contention by the Berrys that one of the instructions given to the jury by the trial court was improper. The particular instruction in question states:
“When a plaintiff is unable to provide a sufficient explanation as to why a treating physician’s testimony has not been introduced into evidence, it is presumed that the testimony of such treating physician would have been adverse to plaintiff’s cause. It is up to the jury to determine if the evidence from other physicians is sufficient or if the explanation is sufficient to overcome the presumption.”
In considering this contention we note that the jurisprudence is replete with cases supporting this kind of instruction. See Brown v. Employer’s Commercial Union Insurance Co., 316 So.2d 194 (La.App.4th Cir. 1975) writ denied 320 So.2d 204 (La.); Malbroux v. Guice, 322 So.2d 390 (La.App.3rd Cir. 1975); Vidrine v. Sentry Indemnity Co., 341 So.2d 558 (La.App.3rd Cir. 1976). The Berrys cite Hemphill v. Strain, 371 So.2d 1179 (La.App.lst Cir. 1979) for the rule that the presumption of unfavorable testimony will not apply where the witness is available to both sides. However, this ease is easily distinguishable from those previously cited in that they relate to a special witness in the form of a treating physician such as Dr. Haslett in the case before us, and Hemphill concerns witnesses in general. Accordingly, we conclude that the trial court’s instruction to the jury was- proper.
The second award for our consideration here was that of $5,000 made to Adrian and Bonnie Berry individually. The Berrys *1270 allege that they have suffered damages of $788 in property damages from the fire, $681 in medical expenses for Shannon and $12,326.60 in lost earnings resulting from Mrs. Berry’s employment termination in order to care for Shannon, for a total of $13,795.58 in damages.
In reviewing the evidence before us we find that the first two items of damages, namely the claim for the property destroyed by fire and the medical expenses, were properly substantiated. However, this finding does not apply with respect to the claim for lost earnings. The record indicates that Mrs. Berry decided to terminate her employment with the U.S. Department of Energy in December of 1978, some 10 months after the accident. The reason given for her termination was that she wanted to spend more time with Shannon who was allegedly continuing to experience difficulties as a result of the fire. Mrs. Berry testified that her departure from her place of employment was purely voluntary and was not made at the recommendation of any of the physicians treating Shannon. Three months after Mrs. Berry terminated her position, or 2 months prior to trial in February 1979, Shannon visited Dr. Jones. At trial Dr. Jones testified that Mrs. Berry did the right thing in withdrawing from employment to care for Shannon. He further indicated that Mrs. Berry should refrain from seeking employment until January 1980, or some 5 months after Shannon started school.
Based on the foregoing the jury awarded only $5,000 damages, presumably $1469 for property damages and medical expenses and the balance for lost wages. We agree. Considering the evidence it is apparent that not all of the wage loss was a necessary result of the accident, and at the same time, Mrs. Berry was certainly caused some wage loss. The exact amount cannot be determined and the jury in its discretion arrived at a lesser figure than that claimed. We cannot substitute our opinion for that of the jury and we cannot say the jury abused its discretion. Reck v. Stevens, 373 So.2d 498 (La.1979). Accordingly we affirm the award.
A final issue for our consideration concerns the costs assessed by the trial court against NOPSI in connection with those claims that have settled and with those for which a trial was conducted.
The settlement agreement entered into between NOPSI and the various claimants states in pertinent part:
By Mr. Ogden:
“ . . . The settlement agreement listed above will be increased by the costs incurred by the participants in this litigation.”
By Judge Garvey:
“What do you mean by costs?
By Mr. Ogden:
“Specifically, the defendant, New Orleans Public Service. I don’t know what the arrangements are with the Sewerage and Water Board. That all court costs, deposition costs and expenses of any kind incurred by the settlement. Plaintiffs will be paid by the New Orleans Public Service.”
By Mr. Irwin:
“And, we will get them together and submit them.”
Of the many costs involved in connection with the settlement, NOPSI contends that it should not be responsible for some of them, including the expert fee of Dr. Courtney Bush, the metallurgist and mechanical engineer, totalling $1,304.40 and the expert fee of Isaac Regenbogen, an appraiser, amounting to $2,152.08.
The Louisiana jurisprudence reflects the view that the amount of an award for an expert’s fee is generally within the discretion of the trial court which will not be set aside in the absence of an abuse of discretion. State, Through Dept. of Highways v. Bougere, 363 So.2d 228 (La.App.4th Cir. 1978); Prentice Oil & Gas Co. v. Caldwell, 355 So.2d 1327 (La.App.lst Cir. 1977), writ denied, 358 So.2d 640 (La.1978). Furthermore, when there is nothing in the record to either support or refute the expert’s fee awarded by the trial court, then there is no basis for a review. G. T. *1271 Blackshere v. Kemper Ins. Co., 352 So.2d 275 (La.App.2d Cir. 1977).
In reviewing the record there is no evidence before us which either serves to support or refute the expert witness fees set by the trial court on behalf of Regenbo-gen and Dr. Bush. This fact, coupled with the sweeping statement made by NOPSI that it would pay, “ . . . all court costs, deposition costs and expenses of any kind incurred by the settlement ...” leads us to conclude that the trial court’s assessment of expert fees was not an abuse of discretion.
In connection with the costs assessed by the trial court as to the claims for which a trial was conducted, NOPSI contends that the trial court abused its discretion in awarding expert witness fees to Mr. Isaac Regenbogen, the appraiser of the property damaged by the fire, and John Clinton, an inhalation therapist who examined Mrs. Clinton on the night of the accident. Under LSA-R.S. 13:3666, a witness shall be awarded an expert’s fee only as follows:
“Witnesses called to testify in court only to an opinion founded on special study or experience in any branch of science, or to make scientific or professional examinations, and to state the results thereof, shall receive additional compensation, to be fixed by the court.”
In determining this fee certain factors are to be taken into consideration including: the degree of skill of the witness, the time spent in preparatory work, the extent and nature of the work performed and the time spent away from his job along with the actual time spent in court. Cole v. Mott, 351 So.2d 1326 (La.App.2d Cir. 1977); State Dept. of Highways v. Miltenburger, 344 So.2d 705 (La.App.lst Cir. 1977). Also, as previously indicated, the amount of an award for an expert’s fee is within the discretion of the trial court and will not be set aside in the absence of an abuse discretion.
The expert witness fee at issue awarded to Regenbogen by the trial court amounted to $2,833.32. This fee was based on appraisals on behalf of different claimants whose property, both movables and immovables, was destroyed by fire, plus an amount for his testimony at trial. Regen-bogen testified that he spent numerous hours consulting with the various parties whose property was destroyed. He also prepared an indepth report describing the various items, including an estimate of the value of each individual item. One of the reports was 25 pages in length. In consideration of these efforts by Regenbogen, coupled with his time spent in court testifying, we find that the trial court has not abused its discretion in awarding the expert witness fee.
John Clinton was awarded an expert’s fee of $150 for his testimony at trial. Under Welton v. Falcon, 341 So.2d 564 (La.App.4th Cir. 1976) a witness who is qualified as an expert is not entitled to a fee if he merely gives testimony as to facts and circumstances which could be stated by a lay witness. Upon examination of the record Clinton was qualified as an expert in the area of inhalation therapy but he merely testified as to facts and circumstances which a lay witness could have expressed. There was no testimony relating to his area of expertise. Accordingly, we find that the trial court abused its discretion in awarding this witness an expert’s fee.
The judgments appealed from are amended only to delete the award of the expert fee of John Clinton, and as thus amended, they are affirmed. Costs of these appeals to be paid by N.O.P.S.I.
AMENDED AND AFFIRMED.