36 So.3d 1004 (2010)
BUFFMAN INC., d/b/a St. Rita's Nursing Facility
v.
LAFAYETTE Insurance COMPANY, Martin Insurance Agency, Incorporated, Ben Ralph And Don Lee.
Nos. 2009-CA-0870, 2009-CA-1241.
Court of Appeal of Louisiana, Fourth Circuit.
April 14, 2010.
Rehearing Denied May 12, 2010.
*1009 Gilbert V. Andry IV, The Andry Law Firm, L.L.C., New Orleans, LA, James A. Cobb, New Orleans, LA, Pascal F. Calogero, Jr., Pascal F. Calogero, Jr., APLC, New Orleans, LA, for Plaintiff/Appellee.
Stephen N. Elliott, Howard B. Kaplan, Francine M. Giugno, Bernard Cassisa Elliott & Davis, A PLC, Metairie, LA, for Defendant/Appellant, Lafayette Insurance Company.
(Court composed of Judge PATRICIA RIVET MURRAY, Judge JAMES F. McKAY, III, Judge DENNIS R. BAGNERIS, SR., Judge EDWIN A. LOMBARD, Judge PAUL A. BONIN).
PAUL A. BONIN, Judge.
Lafayette Insurance Company insured Buffman, Inc., for property damage caused by wind along with resulting business income losses. Having sustained damage and losses following Hurricane Katrina, Buffman sued Lafayette for amounts it claimed Lafayette was obliged to pay under its insurance policy and for statutory penalties because of the insurer's failure timely to tender payment of amounts due. Based upon the jury's verdict set out in responses to special interrogatories, the district court timely entered an amended judgment. Lafayette suspensively appeals, and Buffman devolutively appeals the amount of the penalties. In a later judgment the district court awarded Buffman expert fees and court costs. Lafayette's suspensive appeal of that later judgment has been consolidated with its earlier appeal. For the reasons which follow, we affirm the judgment on damages and penalties, but amend the judgment on expert fees and costs, and, as amended, affirm.

I
Buffman operated a nursing home in St. Bernard Parish under the trade name St. Rita's. Mabel Mangano and her husband, Sal Mangano, are the shareholders of Buffman, a C corporation which also owns the building in which the nursing home operated. Lafayette's policy of insurance covered the building for wind damage. Excluded from coverage was damage caused by flood, wind-driven rain, pre-existing wear and tear, and intentional acts. Lafayette's policy also covered the business's income losses and extra expenses, but only iffor the purposes of this case *1010 the losses and expenses resulted from covered wind damages to the building. The income losses and extra expenses were limited to $600,000 in the aggregate and not more than $200,000 in a month, not to exceed four months.
The high winds of Hurricane Katrina arrived first, in the early morning hours of August 29, 2005. The storm winds continued for some time. After the winds subsided later in the morning, rapidly rising water began to flood the nursing home, with water rising almost to the ceilings in less than an hour. Nursing home residents as well as the Manganos and some of their family members became trapped in the building until the Manganos were able to pull sheets of metal off the roof and, with the use of an ax, make holes in the roof. Through these openings, the Manganos were able to rescue a few of the residents. Many others drowned in the calamity.
Buffman submitted a notice of loss to Lafayette within a week of the storm. Over the next several months Lafayette dispatched adjusters, engineers, and a roofer to the site. The various reports to Lafayette contained certain consistent findings from all of Lafayette's adjusters, engineers, and roofer concerning damage to the building's roof: (1) at least some of the damage was caused by wind and was covered by Lafayette's policy, (2) some of the visible damage was demonstrably attributed to the human rescue efforts, (3) the roof, which had been built in 1985 had some wear and tear, and (4) the building, but not the roof, had been extensively damaged by flood waters. After applying the $2,500 policy deductible, Lafayette tendered $1,150.13 to Buffman for roof damage caused by wind. Lafayette's roofer estimated that the roof could be repaired in not more than eight weeks and, he opined, while the roofing repairs were on-going, it would be necessary to close only portions of the building at a time.
Not satisfied with the tender, Buffman obtained an estimate from a roofer who estimated that the total cost of repairs to the 28,000-square-foot roof to be $609,525. He concluded that the roof was damaged due to the storm's winds. Buffman's roofer observed the damage to the roof which the Manganos had intentionally caused in their rescue efforts. His estimate for repairs was not reduced by any amount attributable to the damage necessitated by the rescue.
Buffman also engaged a structural engineer, who disagreed with the conclusions and estimates of the adjusting and engineering reports obtained by Lafayette. Buffman's structural engineer concluded that the extensive damage to the roof was caused by the storm's winds. Buffman's roofer determined that the repair of the roof would last about four to five months and that the nursing home business could not be reopened or operated during that time.
The extent of any covered losses to the business's income is, of course, dependent upon the extent of the roof damage covered by the policy. The period of delay occasioned by covered roof repairs will control the re-opening or re-commencing business operations occasioned by the necessary repairs.
Buffman filed suit against Lafayette, seeking the amounts due it under the policy of insurance and penalties for Lafayette's allegedly bad-faith failure to tender payment timely. Lafayette filed an amended answer in which it affirmatively pleaded the policy and its exclusions. See La. C.C.P. art. 1005.
Before the trial, Lafayette tendered an additional $4,200 to Buffman for roof repairs.
*1011 The trial court, without objection, submitted special interrogatories to the jury. In its responses, the jury determined that, after the deductible and tenders, Buffman sustained roof damage in the amount of $568,875.90 and sustained resulting business income losses in the amount of $529,473 as well as $6,500 for extra expenses. Additionally, the jury condemned Lafayette to pay a statutory penalty, which it calculated at $1,436,303.57.[1] In its later judgment of May 14, 2009, after a hearing, the trial court ordered that Lafayette pay expert witness fees totaling $84,672.79 and court costs.

II
In this Part we consider Lafayette's first two assignments of error, which seek that we remand the matter for a new trial because of perceived errors by the trial judge in his instructions to the jury and in his allowing certain rebuttal testimony.

A
Lafayette first objects to the jury's determination of the extent of the wind-caused damage to the roof. The jury affirmatively found, in response to special verdict interrogatories, that Buffman's roof sustained damages caused by wind and that the extent of the damages was $568,875.90, after allowing for the policy's deductible and crediting prior payments. See La. C.C.P. art. 1812 A and D. Ordinarily, we would review these findings of fact under the manifest error rule. See Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880, 882 (La. 1993). But in this case, Lafayette does not seek such review; it insists upon a de novo review, or even a remand. The basis for its insistence is its claim that the trial judge gave the jury an erroneous instruction, which instruction it characterizes as an invitation to the jury to disregard the exclusions and limitations of the policy of insurance. "Where legal error interdicts the fact finding process, the manifest error standard no longer applies and, if the record is complete, an appellate court should make its own de novo review of the record." Lam v. State Farm Mutual Automobile Insurance Company, 05-1139, p. 3 (La.11/29/06), 946 So.2d 133, 135.
Nicholas v. Allstate Insurance Company, 99-2522, pp. 8-9 (La.8/31/00), 765 So.2d 1017, 1023, instructs us that in addition to finding an erroneous jury instruction, we must also find that it likely contributed to the verdict before we engage in a de novo review of the jury's verdict:
Louisiana jurisprudence is well established that an appellate court must exercise great restraint before it reverses a jury verdict because of erroneous jury instructions.... The basis for this rule of law is that trial courts are given broad discretion in formulating jury instructions and it is well accepted that a trial court judgment will not be reversed so long as the charge correctly states the substance of the law.... However, when a jury is erroneously instructed and the error probably contributed to the verdict, an appellate court must set aside the verdict.... In the assessment of an alleged erroneous jury instruction, it is the duty of the reviewing court to assess such impropriety in light of the entire jury charge to determine if they *1012 adequately provide correct principles of law as applied to the issued [sic] framed in the pleadings and evidence and whether they adequately guided the jury to its deliberation.... Ultimately, the determinative question is whether the jury instructions misled the jury to the extent that it was prevented from dispensing justice.... (ellipses indicate citations omitted.)
The Louisiana Supreme Court further instructed us in the proper inquiry to make in order to determine whether a jury instruction is "erroneous":
Determining whether an erroneous jury instruction has been given requires a comparison of the degree of error with the jury instructions as a whole and the circumstances of the case.... Because the adequacy of jury instructions must be determined in the light of the jury instructions as a whole, when small portions of the instructions are isolated from the context and are erroneous, error is not necessarily prejudicial. Furthermore, the manifest error standard for appellate review may not be ignored unless the jury charges were so incorrect or so inadequate as to preclude the jury from reaching a verdict based on the law and facts. Thus, on appellate review of a jury trial the mere discovery of an error in the judge's instructions does not itself justify the appellate court conducting the equivalent of a trial de novo, without first measuring the gravity or degree and considering the instructions as a whole and the circumstances of the case. ...
Adams v. Rhodia, Inc., 07-2110, p. 7 (La.5/21/08), 983 So.2d 798, 804-805 (emphasis added; ellipses indicate citations omitted).
The trial judge instructed the jury in the following excerpt from the more extensive charge, with the language which is objectionable to Lafayette italicized:
You must determine whether plaintiff, Buffman, Inc., has sustained a loss and whether that loss is covered by the policy of insurance issued to plaintiff by defendant, Lafayette Insurance Company/United Fire Group Insurance Company.
An insurance policy is a contract between the two parties, Buffman, Inc., and Lafayette Insurance Company/United Fire Group Insurance Company, [sic] it has the effect of law between the parties. Like other contracts, the contract of insurance will generally be enforced according to its terms, and the respective rights and obligations of the parties, both of the insurance company and the policy holder, will be determined by the terms and provisions of the insurance contract. The words of the policy determine the extent of insurance coverage.
The policy at issue here provides coverage for damage or loss caused by wind and excludes damage or loss caused by flood. From the evidence presented, you must make a determination as to which of these, wind or flood, caused a loss. Wind damage is a covered loss in this policy as a "named peril." Flood damage is not a covered loss in this policy. In that context, you should consider the temporal or timing of each event that causes damage or loss. The mere fact that damage or loss occurs by one of the causes, wind or flood, and is later exposed to the other cause is of consequence only to the extent that you decide the damage or loss was caused by one of those perils.
Only if you decide that a loss has occurred for which there is a coverage by a named peril must you calculate or compute that loss.
When the words of an insurance policy are clear and explicit and lead to no *1013 absurd consequences, no further interpretation may be made in search of the parties' intent and the agreement must be enforced as written.
You should not interpret a provision of the insurance policy standing alone, but rather, you should interpret it in light of the other provisions in the policy so that each provision will be given the meaning that is suggested by the insurance policy as a whole. Words and phrases used in a policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning. Where a policy contains a definition of any word or phrase, its definition is controlling.
Further, a broadly worded provision in an insurance policy susceptible of multiple interpretations is ambiguous as a matter of law and should be interpreted in a manner that supports rather than defeats coverage.

Any doubt concerning the limitations on and exclusions from coverage under an insurance policy must be construed against the insurer and in favor of the insured. In order for there to be a recovery on a policy, the cause designated in the policy must have been the proximate, and not a remote, cause of the loss. Wind must be an efficient cause of loss to recover on a windstorm policy. And where the term "direct" is used, referring to the cause of loss, it means proximate or immediate.
The trial judge read to the jury specific provisions of the insurance policy itself in addition to this portion of the charge.
We consider first the italicized objectionable language. The specific language which Lafayette finds objectionable is not without a legal basis in our civilian methodology or in the jurisprudence applying, and to some extent synthesizing, the rules and guides for interpreting contracts. See generally La. C.C. arts. 2045 et seq. and Cadwallader v. Allstate Insurance Company, 02-1637, p. 3 (La.6/27/03), 848 So.2d 577, 580 ("An insurance policy is a contract between the parties and should be construed by using the general rules of interpretation of contracts set forth in the Louisiana Civil Code."). "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. C.C. art. 2046. But La. C.C. 2056 provides an interpretative rule when the meaning of the language of a contract, or insurance policy, is doubtful:
In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text.
A contract executed in a standard form of one party must be interpreted, in case of doubt, in favor of the other party.
Thus, "[a]mbiguous policy provisions are generally construed against the insurer and in favor of coverage." Cadwallader, 02-1637 at p. 3 (La.6/27/03), 848 So.2d at 580.
The condensation of the general rules of interpretation of contracts as set forth in the objectionable portion clearly oversimplifies the detailed and thorough methodology which the Civil Code and the jurisprudence require. By way of a single illustration, the objectionable portion omits an important qualification in determining whether a policy provision is truly ambiguous: "the strict construction rule applies only if the ambiguous policy provision is susceptible to two or more reasonable interpretations." Huggins v. Gerry Lane Enterprises, Inc., 06-2816, pp. 3-4 (La.5/22/07), 957 So.2d 127, 129, citing Cadwallader, supra; see also Sher v. Lafayette Insurance Company, 07-2441, p. 8 *1014 (La.4/8/08), 988 So.2d 186, 194 ("As stated above, when there is an ambiguity in a policy of insurance, the ambiguity should be construed in favor of coverage, but only if the ambiguous policy provision is susceptible to two or more reasonable interpretations." (emphasis in original).) Lafayette itself requested a more detailed, and accurate, special jury instruction on the issue of ambiguous provisions than the standard proposed by the trial judge. See La. C.C.P. art. 1793 A. But, "[i]n making charges to a jury, a trial judge is not required to give the precise instructions submitted by either party, but must give instructions which properly reflect the applicable law in light of the facts of the particular case." Taylor v. Tulane Medical Center, 98-1968 (La.App. 4 Cir. 11/24/99), 751 So.2d 949, 955 (emphasis added). The objectionable language of the charge given may be inadequate, and thus erroneous if the ambiguity of a policy provision had actually been at issue in this case; it would have been too general and simple. But, even if we were to find that the instruction were erroneous, that alone would not be sufficient to set aside the jury's finding; it is necessary that "the error probably contributed to the verdict." See Picou v. Ferrara, 483 So.2d 915, 918 (La.1986).
Here the parties inform us, and our examination of the record confirms, that there was no issue, much less a litigated issue, about ambiguity in any provision of the insurance policy.
The testimony of the lay and expert witnesses was directed to the extent of the damages caused by wind. The building was inundated, not submerged. The roof was unaffected by the flood. The Manganos made no claim for any part of the building but the roof. The trial judge plainly instructed the jury that it was to assess damages caused only by wind. The jury's assessment of damages to the roof was within the range established by testimony. In other words, the jury's assessment did not exceed the highest estimate (and in fact was lower than it) for wind-caused roof damages.
Other than its own dissatisfaction with the jury's assessment of roof damages, Lafayette cannot demonstrate to us any prejudice it suffers from the instruction. Lafayette points us to the proposition set out in Sher v. Lafayette Insurance Company, 07-2441, p. 5 (La.4/8/08), 988 So.2d 186, 192, quoting Huggins, supra, 06-2816 at p. 4, 957 So.2d at 128-129, that interpretation of an insurance policy usually involves a legal question which can be resolved properly in the framework of a motion for summary judgment. From this Lafayette argues that the determination of whether a policy provision is ambiguous is the sole province of the court, not the jury. We have had no occasion to consider whether a trial court's decision to assign the interpretation of a policy exclusively to the jury is reversible error. See Chalmette Retail Center, LLC v. Lafayette Insurance Company, 09-0217, p. 19 n. 11 (La.10/16/09), 21 So.3d 485, n. 11. Nonetheless, we are reinforced in our view that the ambiguity of a policy provision is a non-issue in this case by the circumstance that neither party filed a motion for summary judgment. In our own review of the insurance policy, we do not find any of the relevant provisions concerning the covered peril (wind) or the exclusion (flood) to be ambiguous.
The jury instruction on ambiguous language in an insurance policy, in the context of the issues actually litigated in this case, did not mislead the jury to the extent that it was prevented from doing justice. Nicholas v. Allstate Insurance Company, supra, 99-2522, pp. 9, 765 So.2d at 1023. The objectionable language was a small portion of the instructions; any error due to oversimplification of the controlling *1015 principles of contract interpretation was not so grave when considering the whole of the instructions under the circumstances of the case and the issues litigated, and we would be unjustified in conducting a de novo review. Adams v. Rhodia, Inc., 07-2110, p. 7, 983 So.2d at 804-805.

B
Lafayette's second assignment of error alleges that a new trial is warranted in this matter because the court allowed plaintiff's expert, Anthony Childress, to assert a "new theory of the case" during rebuttal. Because Lafayette has not demonstrated that this testimony amounts to a new theory of the case, we find that the trial court did not abuse its discretion by allowing this evidence on rebuttal.
The court has the power to control the proceedings at the trial so that justice is done. La. C.C.P. art. 1631 A. The trial judge has great discretion in the manner in which proceedings are conducted before his court, and it is only upon a showing of gross abuse of discretion that appellate courts have intervened. Sullivan v. Welch, 328 So.2d 731, 735 (La.App. 3d Cir.1976); Harris v. West Carroll Parish School Bd., 605 So.2d 610, 612 (La.App. 2d Cir.1992). See also La. C.C.P. art 1631 A ("The court has the power ... to control the proceedings at the trial, so that justice is done.").
La. C.E. 611 E states that "[t]he plaintiff in a civil case ... shall have the right to rebut evidence adduced by their opponents." Rebuttal evidence is that which is offered to explain, repel, counteract or disprove facts given in evidence by the adverse party. See State v. Trosclair, 443 So.2d 1098 (La.1983). "The trial court has great discretion in controlling the presentation of evidence, including the power to admit or refuse to admit rebuttal evidence." Beecher v. Keel, 645 So.2d 666, 671 (La.App. 4th Cir.1994).
Lafayette asserts that plaintiff introduced rebuttal testimony by Mr. Childress that constituted a "new theory" of the case that had not been previously disclosed in pretrial discovery. On direct examination, Mr. Childress testified to the contents of his report, discussing particularly the damage to the roof caused by wind uplift. Mr. Meyer, a forensic engineer hired by Lafayette, countered that, upon reviewing the Childress report, he found very little damage due to wind. Buffman's lawyer asked Mr. Meyer on cross-examination about cross-bracing, which he described as an "X-shaped structural component that spans between columns of the building that provides lateral stiffness to the structure." Mr. Meyer said that these bracings are usually tight, but that their loosening is not necessarily an indicator of storm damage, and further, that loose cross-bracing will not indicate whether or not the roof has been damaged. Later, Mr. Meyer admitted that the building was subjected to strong winds, that this could result in a torquing of the building, and that this might be observed upon examination of the cross-bracing. On redirect, Mr. Meyer noted that damage to the cross-bracing could occur in demolition of the building's interior or it could be associated with some other cause.
On rebuttal, and responding particularly to the testimony of Mr. Meyer, Mr. Childress explained that damage to the cross-bracing indicated that the building withstood severe winds in Hurricane Katrina winds that likely caused much of the damage. Mr. Childress said that once the building had been gutted, he could observe that the cross-braceswhich are ordinarily hidden behind the wallshad become torqued or frayed, suggesting that the building had been subjected to severe winds.
Lafayette cites Williams v. General Motors Corporation, 93-0287 (La.App. 4 Cir. *1016 2/11/94), 639 So.2d 275, to support its contention that a new trial is warranted because the trial court improperly allowed testimony of a "new theory" on rebuttal. In Williams, this court, noting that the danger of unfair prejudice substantially outweighed the probative value of the evidence, found that the defendant had been "ambushed" when the trial court allowed plaintiff's expert to testify on redirect to a new theory of causationan alleged manufacturing defectwhere the defendant had spent years preparing a defense against allegations of a design defect. Lafayette has failed to demonstrate how the rebuttal testimony in this case amounts to a "new theory" of causation that justified this court's finding of error in Williams. Here, the theory of causation has not changed: the central dispute remains whether and to what extent the damage to the building was caused by wind. Mr. Childress' testimony was offered to explain, as well as counteract, the testimony of Lafayette's own expert, Mr. Meyer, regarding indications of wind forces to which the building had been subjected. We do not find that Mr. Childress' testimony amounts to a "new theory" of the case as contemplated in Williams. Accordingly, the trial court's admission of Mr. Childress' testimony was not an abuse of discretion. This assignment of error has no merit.

III
In this Part we address Buffman's third assignment of error and consider the reasonableness of the jury's determination of the amount of business income loss occasioned by the repair of the wind-damaged roof. In order to make that determination, we must first review the reasonableness of the jury's determination of the extent of the wind damage to the roof, and the time and circumstances required for the ensuing repairs.
The jury's determinations in these matters were based upon its selection of the testimony of one expert witness over that of an opposing expert. "Credibility determinations, including evaluations of expert testimony, are factual findings." Rosell v. ESCO, 549 So.2d 840, 844 (La.1989); Katner v. Katner, 09-0974 (La. App. 4 Cir. 12/23/09), 28 So.3d 566, 571-72; Chalmette Retail Center v. Lafayette Ins. Co., 09-0217, pp. 15-16 (La.App. 4 Cir. 10/16/09), 21 So.3d 485, 496; Neal Auction Company, Inc. v. Lafayette Ins. Co., 08-0574, p. 11 (La.App. 4 Cir. 4/29/09), 13 So.3d 1135, 1141; Westcott v. Westcott, 08-1339, p. 16 (La.App. 4 Cir. 4/17/09), 11 So.3d 45, 56. Where there are two views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Galen-Med, Inc. v. Porter, 05-0788, p. 14 (La.App. 4 Cir. 3/29/06), 928 So.2d 681, 688. The evaluation of and resolution of conflicts in expert testimony are factual issues to be resolved by the trier of fact, and the determinations of the fact finder should not be disturbed on appeal in the absence of manifest error. Martin v. East Jefferson General Hosp., 91-0393 (La.6/21/91) 582 So.2d 1272, 1276-1277. Accordingly, we review these determinations of fact under a manifest error standard. See Hanks v. Entergy Corp., 06-0477, p. 24 (La.12/18/06), 944 So.2d 564, 581; Sistler v. Liberty Mut. Ins. Co. 558 So.2d 1106, 1111 (La.1990).

A
Having determined that the building sustained damage caused by wind, the jury awarded Buffman $568,875.90[2] for *1017 covered property damage. Although Lafayette has not appealed this amount, we have conducted a thorough review of the record and determined that the jury's award in this category was reasonable. Both parties presented the jury with expert testimony from roofers, structural engineers, and claims adjusters, who gave evidence of the extent of damage to the roof, the cause of damage to the roof, the cost of repair, and the duration for which St. Rita's would need to close until the repairs were complete.
Lafayette's roofer, Jerry Parr, testified that he found very little wind damage to the roof; he attributed a large amount of damage to the rescue efforts during Hurricane Katrina. Mr. Parr based his testimony on Christopher Meyer's wind damage report for Unified Building Sciences, which was also hired by Lafayette. Based on this report, Mr. Parr estimated that the wind damage would cost $5,200 to repair and that the rescue damage would cost $16,200 to repair. Repairing the entire roof, Mr. Parr said, would cost $225,000, or $310,000 with insulation included. He believed that it would take between six and eight weeks to repair the roof, but that the entire building would not need to be shut down during that time, because only portions of the building would need to be closed to complete the repairs.
Luke Vermeulen, a roofer who prepared the August 27, 2007, damage report for Childress Engineering, testified for Buffman regarding the damage to the roof and the extent to which that damage was caused by wind. Mr. Vermeulen testified that his observations indicated that high winds had caused the roof to lift, and he did not believe that flood waters had been high enough to reach the roof or ceiling tiles. Mr. Vermeulen recommended replacing 10,000 square feet of the 28,000square-foot roof. He further recommended elastomeric repairs, 1000 square feet of miscellaneous roof system repairs, and flashing replacement. These repairs would total $330,950. Mr. Vermeulen also recommended that the under deck insulation be replaced at a cost of $112,000 and the ceiling tiles be replaced at a cost of $166, 525. The total estimated cost for these repairs was $609,525.
Lafayette's brief contends that Mr. Vermeulen admitted that replacing the entire roof would cost $90,750 less than the repairs. Lafayette fails to mention, however, that Mr. Vermeulen followed this point by acknowledging that such a deduction is an oversimplification. Mr. Vermeulen clarified that replacing a metal roof in its entirety will require that other structural additions be made in order to keep the building up to code, and this will include unseen costs. The building code, he explained, has different specifications for roof repair and roof replacement. Anthony Childress, the structural engineer who hired Mr. Vermeulen to prepare the Childress report, declined to speculate on the cost of replacing the entire roof, explaining that it would be impossible to estimate until someone engineered it, drew up plans, and priced it.
Importantly, Mr. Vermeulen testified that repair to the roof, assuming the building would be empty of people during the period of repair, would take four to five months. Our examination of the record shows that the jury reasonably could have found that Buffman could not operate its nursing home facility for a period up to four months while the roof was undergoing repair.
The Lafayette policy provided a business income loss limit of $600,000 for a maximum of 120 days, with a monthly limit *1018 of $200,000. The policy, CP 00 30 10 91, Page 1, provides (emphasis added):
We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration." The suspension must be caused by direct physical loss of or damage to property at the premises described in the Declarations, including personal property in the open (or in a vehicle) within 100 feet, caused by or resulting from any Covered Cause of Loss.
1. Business Income means the:
a. Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and
b. Continuing normal operating expenses incurred, including payroll. ...
3. Additional Coverages
a. Extra Expense.
Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss. (Lafayette Policy, Exhibit P-2).
The policy, CP 00 30 10 91, Pages 3-4, states, regarding "Loss Determination":
a. The amount of Business Income loss will be determined based on:
(1) The Net Income of the business before the direct physical loss or damage occurred;
(2) The likely Net Income of the business if no loss or damage occurred;
(3) The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and
(4) Other relevant sources of information, including:
(a) Your financial records and accounting procedures;
(b) Bills, invoices and other vouchers; and
(c) Deeds, liens or contracts.
b. The amount of Extra Expense will be determined based on:
(1) All expenses that exceed the normal operating expenses that would have been incurred by "operations" during the "period of restoration" if no direct physical loss or damage had occurred...
(2) All necessary expenses that reduce the Business Income loss that otherwise would have been incurred.
c. Resumption of Operations

We will reduce the amount of your:
1. Business Income loss, other than Extra Expense, to the extent you can resume your "operations," in whole or in part, by using damaged or undamaged property ... at the described premises or elsewhere.
2. Extra Expense loss to the extent you can return "operations" to normal and discontinue such Extra Expense.
d. If you do not resume "operations," or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.

Under the unambiguous provisions of this policy, Lafayette is obligated to pay Buffman its business income losses when the cause of the suspension of its business operations is the direct physical loss of or damage to property at the premises described in the Declarations through the length of time it would take Buffman to resume its operations "as quickly as possible." See, e.g., Yount v. Lafayette Insurance Company, 08-0380, p. 14 (La.App. 4 Cir. 1/28/09), 4 So.3d 162, 171.

*1019 B
The jury verdict awarded Buffman $529,473 for Business Income Loss and $6,500 for Extra Expense,[3] answering "Yes" to Jury Verdict Form Question No. 4 ("Do you find that the business of Buffman, Inc., which was insured by Lafayette Insurance Company/United Fire Group Insurance Company, sustained a business income loss as a result of the wind damage related to Hurricane Katrina?").
We review "[t]he jury's determination as to the amount of business income loss" as "a factual finding reviewable under the standard of manifest error, which dictates that such a finding may not be disturbed unless it is manifestly erroneous or clearly wrong." Chalmette Retail Center, supra, 09-0217 at pp. 15-16, 21 So.3d at 492; Rosell v. ESCO, supra, 549 So.2d at 844.
In Chalmette Retail, forensic accountants presented opposing calculations of income loss to a corporation. As in the instant case, the jury chose the methodology and opinion of the insured's (CRC's) expert. The court noted,
[T]he disparity between the opinions of the two experts is caused by a difference in methodology.... Nothing in the policy language, which defines the period of restoration as ending when the property "should be repaired, rebuilt, or replaced" indicates that either expert's method of calculation is unacceptable. Neither expert testified as to what factors influenced his determination regarding the period of restoration. However, we cannot say that Mr. Litolffs [CRC's expert] choice to use the date that each business actually reopened in calculating a separate period for each retail space is unreasonable in light of the evidence ... [W]e find no manifest error in the jury's determination that CRC incurred $226,223.00 in unreimbursed business income loss. We therefore decline to disturb the trial court's award of that amount as damages. Chalmette Retail Center, supra, 09-0217, at p. 8, 21 So.3d at 492
Each party introduced expert testimony of a certified public accountant. Buffman called Mr. Chavgney Price, a specialist in business interruption claims and valuations. His firm had produced cost reports for Buffman for over a decade and was familiar with the business operations of the corporation. Lafayette retained Anita Zimmer. In contrast to Mr. Pierce, Ms. Zimmer had only a brief opportunity to review the insurance policy and business records and to prepare a report shortly before trial. She admitted to calculation errors in her report, as pointed out by Mr. Pierce, and admitted that Lafayette should pay Buffman for business loss. The two experts agreed that the Lafayette policy covers projected net income, not net corporate taxable income, or net income or loss reflected on the corporation's income tax returns; however, they disagreed as to the proper methodology for calculating business income loss. The jury chose the methodology and analysis offered by Mr. Pierce.
Buffman operated a nursing home and facility, which cared for 100 patients. It had 100 beds, and provided a spectrum of care to fulfill the individual needs of elderly, bedridden, or otherwise incapacitated residents. Their care was paid for by four sources: Medicare, Medicaid, private insurers, and individual payors. The precise numbers of residents paid for by each of the four sources fluctuated from day to *1020 day. The accounting protocols in order to effect reimbursement and funding from the several governmental and private agencies and payors are fraught with intricate, byzantine requirements.
Mr. Pierce reviewed business records from which he and his staff could extrapolate and project post-Katrina loss. He interpreted the Lafayette policy requirements for proving business income loss, stating that projected net income is what the company would have earned had there not been the disaster which caused the business loss. In addition to the projected net income, the policy covered continuing operating expenses incurred after the event which caused the business interruption, as well as extra expenses incurred as a direct result of the event.
He calculated the business interruption loss from the date of Katrina through February of 2006, approximately four to six months, based on his review of monthly statements of revenue and expenses for St. Rita's for January and February of 2006, for all the months of 2005, and all of 2004. He reviewed monthly statement of operating expenses on the income tax basis for all of 2005 and January and February of 2006. He reviewed the general ledger for 2005 up to August 31, 2005. He looked at the statistical data for skilled nursing facility and skilled nursing facility health care complex (St. Rita's is characterized as both types of facility) for 2004 and 2005.
The changes among the four revenue streams showed that revenue to St. Rita's was going up, and/or the collectability was improving. Whatever the vicissitudes of the sources of the patients and payment for services, and the vagaries of the patient population, the facility was earning more money in 2005 before Katrina hit than it did the preceding year.
To address the insurance policy's definition of loss, requiring net-income data, Mr. Pierce had to project revenues from 2004 and 2005. He analyzed the corporation's income growth rate, comparing the first half of 2004 to the first half of 2005. He testified that he could not compare the second half of 2004 to the second half of 2005 because St. Rita's closed when Katrina struck, terminating the revenue of the nursing facility. Overall the revenue grew by about 12.58 percent between 2004 and the first eight months of 2005; however, between January and July 2005, profit was over 32 percent. Using accepted accounting principles, he concluded that the income loss attributable to St. Rita's closing from August 29, 2005, to February 28, 2006, (a six-month period) would be $775,616; for a five-month period, to January 31, 2006, it would be $649,612. Mindful of the $600,000 policy limit and the 4-month (120-day) maximum terms of the Lafayette policy, Mr. Pierce estimated the business income loss for four months to be $529,473, the precise sum which the jury awarded Buffman.
Neither Mr. Pierce nor Ms. Zimmer reviewed tax returns of Buffman. The Lafayette policy language does not require the insured to submit income tax returns to support its claim for lost business income. Indeed, the policy specifically excludes the component of tax: "Net Profit or Loss before income taxes." (emphasis added). However, reference to tax is relevant to a crucial issue in the business loss calculations: the characterization of emolument for the Manganos from Buffman. First, clearly the named insured on the Lafayette insurance policy in this case is Buffman, a corporation, not Mr. and Mrs. Mangano, its shareholders, officers, the human organizers and forces behind the complex nursing-home enterprise. Second, Buffman is a closely held, or C, corporation. The Manganos chose to structure their corporation as a C corporation for business reasons of their own long before Katrina struck. "The corporation, taxwise, offers *1021 possible advantages by reasonable accumulations of income at corporate rates, capital gains treatment, and employee fringe benefits." Harry G. Henn & John R. Alexander, Laws of Corporations and Other Business Enterprises, (3d ed.1983) § 262, p. 713; see I.R.C. §§ 531-537.
Assuming that the choice of a corporate form (e.g., C corporation,[5] S corporation) is inexorably linked to considerations of tax exposure and other benefits inherent in corporate, rather than individual, business enterprise, one must look to the permissible and customary procedures for handling compensation by a C corporation such as Buffman. And absent evidenceof which there was none at trialthat the Manganos' corporation was under attack by the Internal Revenue Service, the transfer of income whether by salary for services performed or by dividend/bonus,[6] should be irrelevant: both were legitimate business methods as agreed to by both experts.
At issue is whether the bonuses to the Manganos should be characterized as salary, thus covered by the business income loss coverage under the policy. In 2005, the sums paid to the Manganos included $315,000, characterized as a bonus/dividend, and $7,500 every two weeks,[7] characterized as salaries for which the Manganos received W-2 forms. In comparison, in 2004, the Manganos received $1,045,000 in bonuses and in 2004 the corporation paid about $195,000 to the Manganos as corporate officers in their capacities as employees performing services for the nursing home.[8] The Manganos paid individual income tax on the money paid to them both as salaries for their service to and direction of the business (for which they received W-2 forms) and as bonuses (for which they received K-1 forms) when the corporation flourished.
Ms. Zimmer acknowledged that a C corporation commonly distributes taxable net income before the end of a year. Mr. Pierce explained that profiti.e., monies earned by the corporation after payment of expenseswhether characterized as bonus/dividend to shareholders or as salary for services performed for the corporation operating St. Rita's, was made part of his appraisal of net revenue and, accordingly, his evaluation of lost business income.[9]

C
We summarize the findings of fact which are necessary to the jury's award of $529,473 in business income loss to Buffman: (1) supported by the expert testimony of Mr. Vermuelen, that the roof was extensively damaged and that its repair *1022 would require the closure of the nursing home facility for a period of at least four months and (2) supported by the expert testimony of Mr. Pierce, that the income loss for a fourth-month period was $529,473.
We now consider whether the jury's award was within its discretion. The Supreme Court noted in Kaiser v. Hardin, 06-2092, pp. 11-12 (La.4/11/07), 953 So.2d 802, 810:
Special damages are those which have a "ready market value," such that the amount of the damages theoretically may be determined with relative certainty... In reviewing a jury's factual conclusions with regard to special damages, an appellate court must satisfy a twostep process based on the record as a whole: There must be no reasonable factual basis for the trial court's conclusions, and the finding must be clearly wrong....
We are satisfied from the record that the jury had a reasonable factual basis its award and the jury was not clearly wrong in accepting the reasonable findings of Mr. Vermeulen and Mr. Pierce over the opposing findings of other experts.
In light of the reasonableness of the factual findings by the jury, it cannot be concluded that the jury abused its much discretion in the award of $529,473 to Buffman for its business losses. Because the award is within the limits of the policy, there is no basis upon which we as an intermediate appellate court could modify the award.

IV
In this Part we address the parties' contentions regarding the jury's determination that statutory penalties are due and, if they are due, the basis for the assessment and the amount of the penalty. We consider Lafayette's three alternative arguments: first, that its actions were not arbitrary, capricious and without probable cause; second, that, because there was no proof of damages sustained by its commission of an unfair trade practice, § 1220 provides no basis for an award of penalties which would exceed $5,000; and, third, that it had not committed an unfair trade practice by failing to pay within 60 days of Buffman's proof of loss because such failure was not arbitrary and capricious. We also consider Buffman's argument that the jury's assessment of penalties of 130% under § 1220 was inadequate.
The jury, as demonstrated by its answers to interrogatories, found that Lafayette had been arbitrary and capricious in refusing to pay timely the amounts due Buffman under its contract of insurance. The jury decided that Lafayette violated both La. R.S. 22:658 and 1220. Because the amount of the penalty under La. R.S. 22:658 is mandated at 25% on the unpaid amount, the jury is not required to specially assess the amount. La. R.S. 22:1220, however, permits the fact-finder to assess the penalty "in an amount not to exceed two times [200%] the damages sustained or five thousand dollars, whichever is greater." La. R.S. 22:1220 C. See, e.g., Orellana v. Louisiana Citizens Property Insurance Company, 07-1095 (La.App. 4 Cir. 12/5/07), 972 So.2d 1252. Judge Bagneris, writing for our court, noted that § 1220 "clearly states that an insurance company may be assessed general and special damages for breach of the imposed duty, and may be assessed penalties in addition." (emphasis added)
Here the jury, in response to Jury Verdict Interrogatory 8, assessed a penalty of 130% of "the damages sustained." The trial judge awarded Buffman only the § 1220 penalty (which the court calculated to be $1,436,303.57), the greater of the two penalties, in accord with Calogero v. Safeway *1023 Insurance Company, 99-1625, p. 7 (La.1/19/00), 753 So.2d 170, 174.[10]

A
An insurance policy, as we noted earlier, is a contract. In fact and law, it is an aleatory contract. See Succession of Fannaly v. Lafayette Insurance Company, 01-1355, p. 3 (La.1/15/02), 805 So.2d 1134, 1137. La. C.C. art. 1912 provides:[11]
A contract is aleatory when, because of its nature or according to the parties' intent, the performance of either party's obligation, or the extent of the performance, depends upon an uncertain event.
Comment (f) of the Revision Comments 1984 makes plain the import of an aleatory contract:
According to this text, the chance that an aleatory contract contemplates may result in one party not having to perform at all, as in the case of an insurance contract when the risk does not occur, ...
The significance of this legal concept embedded in our civilian law is that the insurer's obligation under the terms of its policy ("we will pay") is contingent upon the occurrence of an event which may never happen. The standard form agreement before us does not contain a time by whichif the event happensthe insurer will perform its obligations to pay its insured. Ordinarily, when the term of performance is not fixed in the agreement, the "obligation must be performed within a reasonable time." La. C.C. art. 1778; see also Guzzo v. Liggio, 224 La. 313, 69 So.2d 357, 358 (1953); Olivier v. Roland, 03-1988, p. 5 (La.App. 4 Cir. 11/30/04), 888 So.2d 998, 1000; Blair v. Diaz, 342 So.2d 1237, 1239 (La.App. 4th Cir.1977); Perrin v. Hellback, 296 So.2d 342, 344 (La.App. 4th Cir.1974). The legislature has, however, imposed upon an insurer, subject to certain conditions, a term of thirty days within which to perform its obligation to pay.
We quote the pertinent portion of La. R.S. 22:658 where the time for performance was set forth, in the version of the statute as it existed at the time of the storm and which undisputedly controls this case. See Sher, supra, 07-2441 at pp. 14-15, 988 So.2d at 199. La. R.S. 22:658 provided in pertinent part:
A. (1) All insurers issuing any type of contract, other than those specified in R.S. 22:656, R.S. 22:657, and Chapter 10 of Title 23 of the Louisiana Revised Statutes of 1950, shall pay the amount of any claim due any insured within thirty days after receipt of satisfactory proofs of loss from the insured or any party in interest....
B. (1) Failure to make such payment within thirty days after such satisfactory written proofs and demand therefor ... as provided in Paragraph[ ] (A)(1) ... when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of twenty-five percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured, ..., or in the event a partial payment or *1024 tender has been made, twenty-five percent of the difference between the amount paid or tendered and the amount found to be due.
C. ...
(emphasis added)
In Louisiana Bag Company, Inc. v. Audubon Indemnity Company, 08-0453, pp. 11-12 (La.12/2/08), 999 So.2d 1104, 1113-1114, the Supreme Court held that
A cause of action for penalties under La. R.S. § 22:658 requires a showing that (1) an insurer has received satisfactory proof of loss, (2) the insurer fails to tender payment within thirty days of receipt thereof, and (3) the insurer's failure to pay is arbitrary, capricious or without probable cause.
See also Yount v. Lafayette Insurance Company, supra, 08-0380, at p. 16, 4 So.3d at 172. A finding by the fact-finder that the insurer acted in a manner which is arbitrary, capricious, or without probable cause is reviewable under the manifest error standard. Louisiana Bag Company, Inc., 08-0453 at p. 29, 999 So.2d at 1122. As we stated in Coig v. Gregoire, 07-1296, pp. 4-5 (La.App. 4 Cir. 4/9/08), 989 So.2d 786, 789:
The determination that an insurer's handling of a claim is arbitrary and capricious may not be disturbed unless manifestly erroneous/clearly wrong.... Because the determination of bad faith in an insurer's evaluation of a claim or in refusing to settle a claim turns on the facts and circumstances of each case, great deference must be accorded to the trier of fact. (citations omitted)
In determining what is arbitrary, capricious, or without probable cause, the Louisiana Supreme Court, referring to the Oxford English Dictionary, has noted that an "arbitrary" act is defined as an act "based on random choice or personal whim, rather than reason or system," and "capricious" means "given to sudden and unaccountable changes in behavior." Reed v. State Farm Auto Ins. Co., 03-0107, p. 13-14 (La.10/21/03), 857 So.2d 1012, 1020. Further, the phrase "arbitrary, capricious, or without probable cause" is synonymous with "vexatious," and a "vexatious failure to pay" is one that is "unjustified, without reasonable or probable cause or excuse." Id. at 1021. These phrases describe an insurer whose willful refusal to pay is not accompanied by a good-faith defense. Lousiana Bag Co., supra, 08-0453 at p. 14, 999 So.2d at 1114.
The Manganos first reported their notice of loss to Lafayette on September 6, 2005, shortly after Hurricane Katrina. Lafayette assigned the claim to Property Loss Consultants (PLC) that same day and received its report on November 9, 2005, which recommended that Lafayette payafter adjusting for depreciation and the deductible$114,862.31 to Buffman for its damages. Lafayette's claims adjuster, Mr. French, refused PLC's recommendation, and Lafayette undertook a subsequent inspection on December 6, 2005, and suggested that an engineering firm assist in determining the cause of the damage. A second adjusting report was prepared by PLC with the assistance of Unified Building Sciences, an engineering firm, on March 7, 2006, and found damages amounting to $255,940. Mr. French again disregarded this report and did not pay according to the recommendation. Lafayette requested yet another inspection by an engineer and a roofer. Despite this information Lafayette did not make a first payment to Buffman until May 5, 2006, almost two years after the storm. When it did make that payment, Lafayette paid $1,150.13 to Buffman for its property damages. Prior to trial, Lafayette tendered an additional payment of $4,200. These payments of significantly smaller amounts than any of Lafayette's *1025 prior consulting reports had recommended were not satisfactorily explained or justified. Lafayette's virtually unexplained decision not to rely upon its experts' recommendations and its payment of such meager sums constitutes vexatious conduct. From these facts, we conclude that the jury could reasonably find that Lafayette's failure to pay was "unjustified, without reasonable or probable cause or excuse." The jury's finding that Lafayette's failure to pay the damages sustained by Buffman under these circumstances was arbitrary, capricious, and without probable cause is not, we conclude, manifestly erroneous.
Because we conclude that the jury's finding that Lafayette was arbitrary and capricious in failing to perform its obligation to pay Buffman within the statutory 30-day period was a reasonable finding which was not clearly wrong, we determine that Buffman would be entitled to collect under § 658 the statutorily stipulated penalty of 25% of its loss unless it is entitled to collect a higher penalty under § 1220. Calogero, supra.

B
We now turn to Lafayette's argument that on the facts of this case there is no legal basis under § 1220 to assess any penalty greater than $5,000. At the time of the storm La. R.S. 22:1220 provided in pertinent part:
A. An insurer, including but not limited to a foreign line and surplus line insurer, owes to his insured a duty of good faith and fair dealing. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both. Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach.
B. Any one of the following acts, if knowingly committed or performed by an insurer, constitutes a breach of the insurer's duties imposed in Subsection A:
...
(5) Failing to pay the amount of any claim due any person by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause.
C. In addition to any general or special damages to which a claimant is entitled for breach of the imposed duty, the claimant may be awarded penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater....
§ 1220 "established ... a private cause of action within the Unfair Trade Practices Act." Theriot v. Midland Risk Insurance Company, 95-2895 (La.5/20/97), 694 So.2d 184, 191. A violation of subsection B(5) constitutes an unfair trade practice by the insurer. Id.
It is agreed by the parties that Buffman did not seek to prove "any general or special damages to which a claimant is entitled for breach of the imposed duty," and the jury did not award such damages. Lafayette argues that in order to recover penalties in excess of a maximum of $5,000 under § 1220, "the insured must first prove that actual damages resulted from the breach of the insurer's obligation of good faith and fair dealing." (Brief at p. 23) While we disagree with Lafayette, we do not mean to diminish or even ignore the considerable body of decisions which explicitly support Lafayette's contention. See, e.g., Mercier v. Allstate Ins. Co., 06-9861, 2007 WL 210786 (E.D.La.1/17/07) and Pride v. American Sec. Ins., 02-2748, *1026 2003 WL 1618566 (E.D.La.3/26/03) as well as Hall v. State Farm Mut. Auto. Ins. Co., 658 So.2d 204 (La.App. 3rd Cir.5/31/95). Lafayette also cites to this court's decision in Brinston v. Automotive Casualty Ins. Co., 96-1982 (La.App. 4th Cir.12/3/97), 703 So.2d 813, one of the holdings of which is clearly abrogated by Calogero, supra.[12] Moreover, Lafayette finds support in Judge Murray's thoughtful exposition of the issue in her dissenting opinion in Neal Auction, supra, 08-0574, p. 18, 13 So.3d at 1147-1153 (Murray, J., concurring in part and dissenting in part). But, we note, none of the decisions which support Lafayette's contention is binding upon us; it is an open question.
An earlier controversy among the circuits as to whether any penalties whatsoever could be awarded in the absence of the proof of this sort of damages was resolved by the Louisiana Supreme Court in Sultana Corporation v. Jewelers Mutual Insurance Company, 03-0360, p. 8 (La.12/3/03), 860 So.2d 1112, 1118-1119, where Justice Knoll wrote for the court:
The penalty provision clearly states, "[I]n addition to any general or special damages to which a claimant is entitled for breach of the imposed duty, the claimant may be awarded penalties ..." (emphasis added.) "In its usual sense, to entitle is ... [t]o qualify for; to furnish with proper grounds for seeking or claiming." BLACK'S LAW DICTIONARY 626 (4th ed.1968). Under the provisions of Section (A) of LA. REV. STAT. ANN. § 22:1220 the insurer "shall be liable for any damages sustained [by the insured or the claimant, or both] as a result of the breach" of its "duty of good faith and fair dealing." Clearly, Sultana is entitled to seek general or special damages from its insurer, Jewelers; it simply chose not to seek such damages in the present case. Notwithstanding, Section (C) of LA. REV. STAT. ANN. § 22:1220 recognizes that the trial court may award penalties "[i]n addition to any general or special damages to which a claimant is entitled." Requiring the insured or claimant to prove general or special damages as a prerequisite to the award of penalties as advocated in the First Circuit, even though the insured or claimant has not so claimed, interjects a requirement not provided in the statute. (emphasis added.)
The Supreme Court concluded that "the appellate court erred in requiring the insured to prove that it suffered damages as a prerequisite for the discretionary award of penalties under subsection (C) of LA. REV. STAT. ANN. § 22:1220." Sultana Corporation, supra, 03-0360 at p. 9, 860 So.2d at 1119 (emphasis added). Although the court "remanded to the trial court for consideration of the award of penalties..." Id., 03-0360 at p. 10, 860 So.2d at 1119, there was no discussion of the basis upon which the penalties might be assessed and certainly no direction to the trial court implying that any discretionary award of penalties could not exceed $5,000.
When we look back to an important early decision involving the interplay between §§ 658 and 1220, we are satisfied that the third circuit first understood not only that § 1220 did not require the kind of damages which Lafayette now argues must be shown to exceed an award of penalties of $5,000, but also that the doubling of the "damages sustained" also applied to the contractual damages sustained by the insured. Wells v. Houston, 95-202 (La.App. 3 Cir. 6/7/95), 657 So.2d 474. *1027 Wells, of course, is the genesis of the proposition approved by the Louisiana Supreme Court that when the penalties provided in § 1220 exceed those of § 658, only penalties under § 1220 can be recovered. See Calogero, supra, 99-1625, p. 7, 753 So.2d at 174 ("This holding is not in conflict with the court of appeals' correct legal finding that where La. R.S. 22:1220 provides the greater penalty, La. R.S. 22:1220 supersedes La. R.S. 22:658 such that Calogero cannot recover penalties under both statutes.") See also Calogero v. Safeway Insurance Company, 99-26, p. 8 (La.App. 3 Cir. 5/5/99), 735 So.2d 816, 821 ("As mentioned previously, La. R.S. 22:1220(C) provides that penalties may be 'assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater.' This penalty provision supersedes the penalty provision of La. R.S. 22:658(B)(1) because it assesses the greater penalty. Wells v. Houston, ...") Excluding contractual damages from the assessment of § 1220 penalties does not follow logically from the prohibition of assessing § 658 penalties and § 1220 penalties in the same case. Stated differently, if contractual damages are not included in "the damages sustained" provision of § 1220, it would not be necessary to prohibit double recovery under both statutes. Nevertheless, we cannot ascertain from the results in both Wells and Calogero whether the § 1220 penalty provision allowing for "two times" the "damages sustained" would have been applied to the contractual damages alone because the $5,000 penalty provision was greater than the § 658 penalty in both cases.
We look, therefore, first to our decision in Sterling v. U.S. Agencies Casualty Company, Inc., 01-2360 (La.App. 4 Cir. 5/15/02), 818 So.2d 1053, which predated but is in harmony with the holding of Sultana Corporation. Judge McKay, writing for our court, did not require proof of damages caused by the unfair trade practice. In Sterling the insurer had reneged on a settlement with its insured, which was a violation of § 1220. The insurer had agreed to pay the value of the insured's stolen automobile. Before payment was made, the car was recovered and the insurer wanted instead to pay over $10,000 less than agreed. The trial court awarded penalties, but had not expressed its legal authority. Judge McKay wrote that
It is evident to this court that the trial court reached the figure of $25,000 by doubling the amount of damages ... In order to prevail on a claim for penalties... under La. R.S. 22:1220, the claimant must first establish that the insurer received satisfactory proof of loss, failed to pay the claim within the applicable period, and that the failure to timely tender a reasonable amount was arbitrary. (citation omitted)
Sterling, supra, 02-2360 at p. 6, 818 So.2d at 1057. Notably, Sterling, consistent with the later holding in Sultana Corporation, did not require the proof of the kind of damages from the breach of the insurer's duty which Lafayette now argues.[13]
Fortified by our decision in Sterling, we think that Lafayette's argument is based upon an overly restrictive meaning of the words "the damages sustained" in subsection (C), limiting its reference to subsection (A) and ignoring the contractual damages. This policy of insurance is governed by the provisions of Title IV of Book III of *1028 the Civil Code. See La. C.C. arts. 1914 and 1915. La. C.C. arts. 1994 et seq. are in that title and govern this dispute.
La. C.C. art. 1994 provides:
An obligor is liable for the damages caused by his failure to perform a conventional obligation.
A failure to perform results from nonperformance, defective performance, or delay in performance. (emphasis added).
Importantly, La. C.C. art. 1995 further provides: "Damages are measured by the loss sustained by the obligee and the profit of which he has been deprived." (emphasis added) La. C.C. art. 2000 in pertinent part also governs the dispute:
When the object of the performance is a sum of money, damages for the delay in performance are measured by the interest on that sum from the time it is due, at the rate agreed by the parties or, in the absence of agreement, at the rate of legal interest fixed by R.S. 9:3500. The obligee may recover these damages without having to prove any loss, and whatever loss he may have suffered he can recover no more. If the parties, by written contract, have expressly agreed that the obligor shall also be liable for the obligee's attorney fees in a fixed or determinable amount, the obligee is entitled to that amount as well. (emphasis added).
In this case, Lafayette's obligation is to pay money to Buffman in an amount reasonably assessed by the jury to pay for covered losses. Reading the three articles in pari materiae, it is evident that "damages sustained" by Buffman within the contemplation and application of subsection (C) extends to and includes payment, with interest, of the amount of Buffman's loss of business income and damage to its roof. These damages sustained by Buffman may or may not have been the only damages sustained by Buffman, but they were the only ones sought by Buffman. Just as in Sultana Corporation, Buffman is not deprived of § 1220 penalties merely because it did not seek "any general or special damages to which a claimant is entitled for breach of the imposed duty" in addition to the other damages sustained by it.
We find further support for our view in our recent decision in Neal Auction, supra, that Lafayette's contention is far too restrictive. In that decision our court modified a trial court judgment based upon a jury verdict, and determined that the insured was entitled to $253,699 in business income loss under the policy and $412,312 in damages for the insurer's breach of its duty under § 1220. Our court then stated that "we find that an award of double the damages under La. R.S. 22:1220, or $1,332,022.00, is appropriate under these particular facts and circumstances." Id., 08-0574 at pp. 17-18, 13 So.3d at 17-18. In other words, the court understood the "damages sustained" to comprehend both the damages from the insured's failure to perform its conventional obligation and the damages from its commission of an unfair trade practice. While it is true that the majority opinion did not explain the basis for its inclusion of the contractual damages in "the damages sustained" which it doubled under § 1220, in light of Judge Murray's dissent, supra, one could hardly suggest that the decision was inadvertent or unexamined.
We, therefore, conclude that as a matter of law, not inconsistent with the holding of Sultana Corporation and guided, if not governed, by our own decisions in Sterling and Neal Auction, the failure of Buffman to seek or prove "any general or special damages to which a claimant is entitled for breach of the imposed duty" does not ipso facto preclude Buffman from an award of penalties under § 1220 C, and those penalties, which are discretionary, may be calculated *1029 on damages sustained by the insured from the breach of the insurer's contractual obligation. $5,000 is not necessarily the maximum penalty awardable under § 1220 when there has been no proof of damages for breach of the imposed duty.

C
The Supreme Court has observed more than once that "[t]he conduct prohibited at La. R.S. 22:1220 B(2) and (5) is closely related to the conduct prohibited in La. R.S. 22:658, A(1) and (4)." Midland Risk Insurance Company, 694 So.2d at 192, n. 14. See also Calogero, supra, 99-1625, at pp. 6-7, 753 So.2d at 174, where the court in elaborating the "close relationship" between the two statutes stated:
In fact, the conduct prohibited is virtually identical, i.e. failure to timely pay a claim after receiving satisfactory proof of loss when that failure to pay is arbitrary, capricious or without probable cause. The primary difference is that under La. R.S. 22:658, subd. A(1), the insurer must pay the claim within 30 days of receiving satisfactory proof of loss, rather than the longer 60-day period allowed under La. R.S. 22:1220, subd. B(5). (emphasis added)
Lafayette agrees that it did not perform within the 60-day period. For the same reasons that the jury was reasonable in finding that Lafayette was arbitrary and capricious for not paying Buffman's loss within the 30-day period under § 658, we find the jury was reasonable in finding that Lafayette was arbitrary and capricious for not paying Buffman's loss within the 60-day period under § 1220.

D
Buffman's sole assignment of error in its answer to the appeal is that the jury's assessment of 130% of the damages sustained by it is inadequate. The award of penalties under § 1220 C is discretionary with the fact finder. Sultana Corporation, supra, 03-0360 at p. 9, 860 So.2d at 1119. We review the award under the abuse of discretion standard. See Veade v. Louisiana Citizens Property Corporation, 08-0251, p. 12 (La.App. 4 Cir. 6/4/08), 985 So.2d 1275, 1283. Much of Buffman's justification for its request that the award be increased is based upon facts not in the record; there is nothing in the balance of its argument which merits increasing the assessment made by the jury. Therefore, the jury's imposition of a penalty equal to 130% of the "damages sustained" by Buffman will not be disturbed.[14]

V
In this Part we consider Lafayette's assignment of error regarding the trial court's award to Buffman of $84,672.79 in expert witness fees plus court costs. After conducting a hearing on those issues, the trial court entered judgment on May 14, 2009, condemning Lafayette to pay the sum of both stipulated costs and disputed expert witness fees.
On the trial court's award of expert witness fees and court costs, "[t]he standard of review for this Court is whether there was an abuse of discretion by the district court." Saden v. Kirby, 01-2253, p. 1 (La. App. 4 Cir. 8/7/02), 826 So.2d 558, 560; Mossy Motors v. Water Board of the City of New Orleans, 01-0386, p. 5 (La.App. 4 Cir. 9/19/01), 797 So.2d 133, 137.
*1030 As the prevailing party, Buffman may be awarded costs by the trial court pursuant to La. C.C.P. art. 1920, which states:
Unless the judgment provides otherwise, costs shall be paid by the party cast, and may be taxed by a rule to show cause.
Except as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable.
See Rathey v. Priority EMS, Inc., 04-0199, pp. 62-63 (La.App. 4 Cir. 1/12/05), 894 So.2d 438, 477-78; Delaney v. Whitney National Bank, 96-2144 (La.App. 4 Cir. 11/12/97), 703 So.2d 709, 720.
"The costs of the clerk, sheriff, witness' fees, costs of taking depositions and copies of acts used on the trial, and all other costs allowed by the court, shall be taxed as costs." La. R.S. 13:4533. "The trial court has great discretion in assigning costs and an award will not be reversed unless there is an abuse of discretion." Sanderford v. Lombard, 96-1171(La. App. 4 Cir.1996), 685 So.2d 1162, 1168; D'Angelo v. New Orleans Public Service, Inc., 405 So.2d 1262, 1271(La.App. 4th Cir. 1981).
The same rule applies to the taxing of expert witness fees, as we noted in Boseman v. Orleans Parish School Board, 98-1415, pp. 9-10 (La.App. 4 Cir.1/6/99), 727 So.2d 1194, 1199:
As with other costs, a trial judge enjoys great discretion under La. C.C.P. art. 1920 in the taxing of expert witness fees.... Moreover, a trial court has discretion to refuse to tax the costs of the prevailing party's expert witnesses against the losing party.
La. R.S. 13:3666 provides for compensation for expert witnesses, as follows:
A. Witnesses called to testify in court only to an opinion founded on special study or experience in any branch of science, or to make scientific or professional examinations, and to state the results thereof, shall receive additional compensation, to be fixed by the court, with reference to the value of time employed and the degree of learning or skill required.
B. The court shall determine the amount of the fees of said expert witnesses which are to be taxed as costs to be paid by the party cast in judgment either:
(1) From the testimony of the expert relative to his time rendered and the cost of his services adduced upon the trial of the cause, outside the presence of the jury, the court shall determine the amount thereof and include same.
The parties stipulated that Buffman's expenses attributable to Venue Docket and Mr. Pierce's expenses were properly taxable as costs. They stipulated that $20,324.43 of Childress Engineering Services, Inc.'s expenses were properly taxable as costs.
In dispute are Childress Engineering Services, Inc.'s invoices for payment to subcontractors and engineering and consulting services prior to trial which total $48,232.51, which are in addition to the stipulated charges totaling $20,324.43. The trial court in its Reasons for Judgment awarding the disputed additional amount to Buffman stated that
[i]n light of Childress Engineering Services's expertise and the size and complexity of Buffman's claim, these fees are reasonable. Therefore the $48,232.51 charge to Buffman for this work constitutes a recoverable expense and is properly taxed as expert fees.
Lafayette disputes the propriety of the charges for work not related to appearance as an expert at trial. The trial court awarded those charges without detailed evidence at the costs hearing *1031 elucidating details and the nature of the substantial costs, including payments to subcontractors. It was clear that from the outset of its being retained by plaintiff, it was to participate in the forthcoming litigation, as it customarily did as part of its business enterprise. The trial court may consider several factors in setting expert fees and related costs: time spent testifying at trial, time spent in preparatory work for trial, time spent away from regular occupation while waiting to testify, the extent and nature of services performed, and the expert's skill, knowledge and attainments, the amount in controversy, the complexity of the problem addressed by the expert, the helpfulness of the expert's testimony to the court, and similar cases' awards to experts. See, e.g., Samuel v. Baton Rouge General Medical Center, 99-1148, p. 8 (La.App. 1 Cir. 10/2/00), 798 So.2d 126, 132. An expert may receive fees for work done in preparation for trial, not consultations assisting the attorney to prepare for trial. See, e.g., Smith v. Roussel, 00-1672, p. 6 (La.App. 1 Cir. 6/22/01), 808 So.2d 726, 731.
In this case, the trial court abused its discretion in awarding the entire sum sought by Buffman for the invoices of the Childress firm without substantial proof of the nature of the charges and services. See, e.g., Allen v. Roadway Express, Inc., 31,628, p. 5 (La.App.2d Cir.2/24/99), 728 So.2d 1015, 1018, which states:
[W]e recognized an incongruity in requiring an expert to attend a contradictory hearing after a trial and thereby increase the cost to the litigant who hired him in the first place. However,... fees that professional experts charge their clients reflect private interests and are matters of conventional contract, while the fees, if any, that are to be assessed as costs against a litigant who is cast in judgment are matters of policy to be legislatively and judicially determined in the public interest.
A litigant is only entitled to recover as costs the expert fees incurred directly in connection with the expert's assistance at the trial. The disputed amount of $48,232.51 is not allowed under these facts. An additional fee of $3,590.85, claimed for the testimony of Mr. Joey Childress at the hearing, is also not allowed. Accordingly, we reduce the total award of expert witness fees and court costs to the stipulated costs totaling $32,849.43 in the May 14, 2009, judgment together with court costs as set by the Clerk of Court for the 34th Judicial District Court and by the Clerk of this Court for costs of this appeal.

DECREE
We affirm the judgment dated October 17, 2008, in favor of Buffman, Inc. and against Lafayette Insurance Company in the full amount of $1,104,848.90, with legal interest thereon from the date of demand until paid, together with a penalty in the amount of $1,436,303.57, with legal interest thereon from October 17, 2008.
We amend the judgment dated May 14, 2009, and, as amended, affirm the judgment in favor of Buffman, Inc. and against Lafayette Insurance Company in the full amount of $32,849.13, together with all court costs as set by the Clerk of Court for the 34th Judicial District Court and by the Clerk of this Court for all costs of this appeal.
JUDGMENT OF OCTOBER 17, 2008, AFFIRMED; JUDGMENT OF MAY 14, 2009, AMENDED AND, AS AMENDED, AFFIRMED.
MURRAY, J., Concurs in Part and Dissents in Part with Reasons.
McKay, J., Concurs.
*1032 BAGNERIS, J., Dissents for the Reasons Assigned by J. LOMBARD.
LOMBARD, J., Dissents with Reasons.
MURRAY, J., Concurs in Part and Dissents in Part with Reasons.
I concur in the majority's affirmation of the trial court's award of damages under the insurance policy for property loss and business income loss. I also concur in the majority's reduction of the amount of costs awarded by the trial court. However, for the reasons that follow, I dissent from the majority's affirmation of the trial court's award of statutory penalties in the amount of $1,436,303.57.
I find no manifest error in the jury's determination that Lafayette acted arbitrarily, capriciously or without probable cause in failing to pay the amount due under the insurance policy within sixty days of its receipt of satisfactory proof of loss. However, because Buffman did not seek to prove that any damages were sustained as a result of this breach of duty by Lafayette, I believe that La. R.S. 22:1220 does not authorize the imposition of a penalty greater than $5,000.00.
The pertinent language in Section C of the statute is: "In addition to any general or special damages to which a claimant may be entitled for breach of the imposed duty, the claimant may be awarded penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater...." (Emphasis supplied). In my view, a plain reading of the above-cited provision indicates that the trial court may, in its discretion, assess against the insurer a penalty based upon a percentage of the damages sustained by the insurer's breach, up to two hundred percent (two times those damages), or, in a case in which such damages are either nonexistent or slight (such that two times their amount would be less than $5,000.00), the trial court may assess any amount that does not exceed $5,000.00.
In the instant case, although it is undisputed that Buffman failed to prove it sustained any general or special damages as a result of Lafayette's breach, the trial court awarded pursuant to La. R.S. 22:1220 a penalty of one hundred thirty percent (130%) of the contractual damages, i.e., the amount found to be due under the insurance policy. Lafayette asserts that under the express terms of the statute, when there have been no damages sustained as a result of the insurer's breach, there is no basis upon which to assess a penalty greater than $5,000.00. While acknowledging the existence of a considerable body of non-binding jurisprudence supporting Lafayette's assertion, the majority concludes that this issue is "an open question." After performing its own analysis of caselaw, the majority then decides that the penalty assessed by the trial court in the instant case is permitted by the statute.
I agree with the majority that the Louisiana Supreme Court has not specifically addressed the issue presented herein, and that there is no binding authority to which we must acquiesce in resolving this purely legal question. Nevertheless, the appropriate starting point for resolving any question of statutory interpretation is the language of the statute itself. In re Louisiana Health Service and Indemnity Co., 98-3034, p. 10 (La.10/19/99), 749 So.2d 610, 615; La. Civ.Code art. 9. Considering that language, I cannot agree that the penalty award made by the trial court in the instant case is sanctioned by La. R.S. 22:1220.
R.S. 22:1220 provides for the mandatory assessment against the insurer of any "damages sustained as a result of the breach," as well as the discretionary assessment of penalties "in an amount not to *1033 exceed two times the damages sustained or five thousand dollars, whichever is greater." See Calogero v. Safeway Ins. Co. of Louisiana, 99-1625, pp. 6-7 (La.1/19/00), 753 So.2d 170, 174; Sultana Corp. v. Jewelers Mut. Ins. Co., 03-0360, pp. 5-6 (La.12/3/03), 860 So.2d 1112, 1117; Kozina v. Zeagler, 94-413, p. 7 (La.App. 5 Cir. 11/29/94), 646 So.2d 1217, 1221; Ibrahim v. Hawkins, 02-0350, p. 6 (La.App. 1 Cir. 2/14/03), 845 so.2d 471, 477-78. The amount of penalties that can be awarded under this statute is based upon the damages sustained by the breach, not the damages claimed or awarded; therefore, if there are no damages proven as a result of the insurer's breach of its duties, the maximum penalty that the trial court can award under R.S. 22:1220 is $5,000.00. Brinson v. Automotive Cas. Ins. Co., 96-1982, p. 7 (La.App. 4 Cir. 12/3/97), 703 So.2d 813, 817[1]; Hollier v. State Farm Mut. Auto. Ins. Co., 01-0592, pp. 5-6 (La.App. 3 Cir. 10/31/01), 799 So.2d 793, 797; Hall v. State Farm Mut. Auto. Ins. Co., 94-867, pp. 7-8 (La.App. 3 Cir. 5/31/95), 658 So.2d 204, 206.
Relying primarily on Sultana Corp. v. Jewelers Mut. Ins. Co., 03-0360 (La.12/3/03), 860 So.2d 1112, the majority holds that in the absence of any damages caused by the insurer's breach, the trial court may assess a penalty under La. R.S. 22:1220 in an amount up to two times the contractual damages sustained by the insured. However, an analysis of the Sultana decision shows that it does not support the majority's holding.
In Sultana, the insured ("Sultana") and the insurer reached a written settlement of the claim on February 1, 2001.[2] Approximately 40 days later, when the insurer still had not paid the settlement, Sultana demanded payment and filed a motion for penalties under La. R.S. 22:1220. Claiming that its failure to pay had been a clerical error, the insurer issued Sultana a check for the settlement amount within a few days of Sultana's demand. Subsequently, after hearing Sultana's motion, the trial court ruled that Sultana was not entitled to penalties because Sultana had not proved that it had sustained any damages as a result of the insurer's delay in paying the settlement.[3] On appeal, the Third Circuit, relying on its own prior decisions, ruled that the trial court did not err by requiring Sultana to prove such damages as a prerequisite to the court's consideration of whether to assess any penalties. The Supreme Court granted writs to reconcile a split among various appellate courts "on the narrow issue of whether actual damages must be proven before penalties may be assessed" under La. R.S. 22:1220. 03-0360, p. 3, 860 So.2d at 1115. Ultimately, the Supreme Court reversed the Third Circuit and held that *1034 the absence of proof of actual damages does not preclude the trial court from assessing discretionary penalties under Section C of the statute. The Court then remanded the matter to the trial court "for consideration of the award of penalties in accordance with the views expressed in this opinion." Id., p. 10, 860 So.2d at 1119.
Sultana clearly does not stand for the proposition that the phrase "general or special damages to which a claimant is entitled for breach of the imposed duty" in Section C means the insured's contractual damages. Indeed, the damages referred to by the Court in Sultana have to be separate and distinct from the insured's contractual damages because in Sultana, the insurer's payment of the settlement had eliminated any claim for contractual damages. Therefore, the Sultana case does not support the majority's view that Section C penalties may be based upon contractual damages or the total damages awarded as opposed to the damages caused by the insurer's breach of its duties under the statute. Moreover, the failure of the Sultana Court to include in its remand any restriction on the amount of penalties the trial court could assess does not, as the majority suggests, mean that the statute does not impose any such limitations. Indeed, because under the statute, making any award of penalties is discretionary, as the Sultana Court confirmed, its remand was simply necessary to enable the trial court to exercise its discretion.
Besides Sultana, the majority also relies upon two of this court's prior decisions, Neal Auction Co. v. Lafayette Ins. Co., 08-0574 (La. App 4 Cir. 4/29/09), 13 So.3d 1135; and Sterling v. U.S. Agencies Cas. Co., Inc., 01-2360 (La.App. 4 Cir. 5/15/02), 818 So.2d 1053. I find this reliance to be misplaced.
In Neal Auction, which concerned a business interruption policy issued by Lafayette, the jury had found, pursuant to a special verdict form, that the plaintiff had sustained $253,699 in business income loss (contractual damages), as well as $500,000 in damages as a result of Lafayette's breach of an insurer's duties of good faith and fair dealing under La. R.S. 22:1220.[4] On appeal, this court affirmed the business income loss award but reduced the award of damages sustained by the breach of the statute to $412, 312. Then, without addressing the issue of whether the "damages" referred to in La. R.S. 22:1220 C are the contractual damages, the damages sustained as a result of the breach, or the total damages, this court awarded penalties equal to two times the total damages of $666,011. I concurred in the award of business income loss, but dissented on the basis that there was no evidence to show that the plaintiff had sustained any damages as a result of the breach of the statute and therefore was entitled to no more than $5,000 in penalties under La. R.S. 22:1220 C. I also noted that the awarding of penalties in the amount of two times the total damages was not authorized by 22:1220 C. Neal Auction, 13 So.3d at pp. 1147-1153 (Murray, J., concurring in part and dissenting in part). Nevertheless, because the issue was not specifically addressed, I do not believe Neal Auction stands for the proposition that the term "damages" in La. R.S. 22:1220 C means the total damages awarded, including contractual damages.
Sterling v. U.S. Agencies, the other Fourth Circuit case relied upon by the *1035 majority, involved the theft of an automobile and an automobile liability policy. The plaintiff/ vehicle owner and his insurer had settled upon the amount of $11,450 as the value of the vehicle, which amount the insurer had failed to pay within thirty days of the signing of the written settlement agreement (a violation of La. R.S. 22:1220 B(2)). Because the vehicle had been found, albeit damaged, by the police within that thirty-day period, the insurer argued that it owed the insured a lesser amount to cover the damage to the vehicle. The trial court found the insurer was "arbitrary and capricious" and awarded the plaintiff $25,000, less the plaintiff's $500 deductible. One of the issues on appeal was whether the trial court was justified in awarding penalties without specifying which statute the penalties were awarded under. Another issue was whether the amount of the penalties should have been based upon the amount of the settlement or the cost of repairing the vehicle, which was $843.24. Sterling, 01-2360, p. 3, 818 So.2d at 1053. This court affirmed the award of $25,000.00, finding that the evidence supported a penalty award of double the amount of the settlement less the $500 deductible (or $22, 900) pursuant to La. R.S. 22:1220, plus $2100 in attorney fees pursuant to La. R.S. 22:658.[5]Id., 01-2360, p. 6, 818 So.2d at 1057.
Again, in the absence of any discussion of the particular issue, I do not believe Sterling provides authority for the majority's conclusion that La. R.S. 22:1220 C authorizes the assessment of a penalty based upon a percentage of the contractual damages or the total damages as opposed to the damages sustained as a result of the breach of that statute.
While I do not agree that either Neal Auction or Sterling provides any authority for the interpretation of the statute adopted by the majority herein, I do agree that, considering the conflicting body of appellate jurisprudence and the lack of a Supreme Court case directly addressing this issue, it is jurisprudentially an "open question." However, as long as it remains so, I believe the statute should be interpreted by looking first at the language of the statute itself. Considering that language, I cannot agree that La. R.S. 22:1220 C authorizes a penalty greater than $5,000 in the instant case.
Accordingly, for the reasons stated, I respectfully dissent from the majority's affirmation of the trial court's penalty award. I would vacate the amount awarded and instead award penalties under La. R.S. 22:658 equal to twenty-five percent (25%) of the sum of the amounts found to be due under the insurance policy for property loss and business income loss. In all other respects, I concur in the result reached by the majority.
McKAY, J., Concurs.
I concur with the result reached in Judge Bonin's opinion.
BAGNERIS J., Dissents.
For the reasons assigned by J. Lombard, I respectfully dissent from the majority opinion.
LOMBARD, J., Dissents.
For the reasons that follow, I respectfully dissent.
A trial judge has a duty to give instructions which properly reflect the law applicable *1036 in light of the facts of the particular case. Guidry v. Bank of LaPlace, 94-1758 (La.App. 4 Cir. 9/15/95, 661 So.2d 1052). 661 So.2d 1052, 1055 (citing Barnett v. New Orleans Public Service, Inc. 489 So.2d 452, 454-55 (La.App. 4 Cir.1986)). In order to fulfill that duty, the trial judge must both require that the jury consider only the correct law and avoid confusing the jury. Guidry, supra (citing Kennedy v. St. Charles General Hosp. Auxiliary, 630 So.2d 888, 895 (La.App. 4 Cir.1993), writ denied, 634 So.2d 863 (La.1994)).
An insurance contract must be construed as a whole, and each provision in the policy must be interpreted in light of the other provisions so that each provision is given the meaning suggested by the whole; one portion of the policy should not be construed separately at the expense of disregarding other provisions. La. Civ. Code art. 2050; Peterson v. Schimek, 98-1712, p. 5 (La.3/22/99), 729 So.2d 1024. Absent a conflict with statutory provisions or public policy, insurers are entitled to limit their liability and to impose and enforce reasonable conditions upon the policy obligations they contractually assume.. Louisiana Ins. Guar. Ass'n v. Interstate Fire & Casualty, 93-0911, p. 5, (La. 1/14/94), 630 So.2d 759, 763. Accordingly, interpretation of an insurance contract is a legal question usually resolved in the framework of a motion for summary judgment. Robinson v. Heard, XXXX-XXXX, p. 4 (La.2/26/02) 809 So.2d 943, 945; see also La. Civ.Code art. 2045; Succession of Fannaly v. Lafayette Insurance Co., 01-1144, 01-1343, 01-1355, 01-1360, p. 3 (La.1/15/02), 805 So.2d 1134, 1137 (role of the judiciary in interpreting insurance contracts is to ascertain the common intent of the insured and insurer as reflected by the words in the policy).
Louisiana Code of Civil Procedure Article 1792 provides that "[a]fter the trial of the case and the presentation of all the evidence and arguments, the court shall instruct the jurors on the law applicable to the cause submitted to them." La.Code Civ. Proc. art. 1792(B). Jury instructions serve to identify issues of material fact and to inform the jury of the appropriate standards of law by which to decide them. 89 C.J.S. Trial § 485. Thus, instructions should tell the jury what it must believe from the evidence in order to resolve each dispositive factual issue in favor of the party who has the burden of proof on the issue. 75A Am.Jur.2d Trial § 90; (citations omitted). In more general terms, the purpose of instructions is to furnish guidance to the jury in its deliberations and aid the jury in clearly comprehending the case in order to reach a correct, just, and fair verdict. 89 C.J.S. Trial § 485. Adequate jury instructions are those which fairly and reasonably point out the issues and which provide correct principles of law for the jury to apply to those issues. Adams v. Rhodia, Inc., 2007-2110, pp. 6-8 (La.5/21/08), 983 so.2d 798, 804-05. In addition, Louisiana Code of Civil Procedure Article 1812, pertaining to special jury verdicts provides, in pertinent part, that "[t]he court shall give to the jury such explanation and instruction concerning the matter submitted as may be necessary to enable the jury to make its findings upon each issue." La.Code Civ. Proc. art. 1812(A) (emphasis added). The use of the word "shall" indicates that the trial court judge has a mandatory duty to accurately instruct the jury on all necessary factual issues that the jury is required to decide based upon the facts and evidence of the case. Berg v. Zummo, XXXX-XXXX, p. 13 n. 5 (La.4/25/01), 786 So.2d 708, 716 n. 5 (implicit in this language is that "... the trial court give accurate and necessary instructions based upon the facts and evidence of the case."); see also Maraist & Lemmon, 1 La. Civ. Law Treatise, Civil Procedure, § 11.10, p. 303: Wilson v. *1037 Transportation Consultants, Inc., XXXX-XXXX, p. 9 (La.App. 4 Cir. 3/2/05), 899 So.2d 590, 599 (citing Berg v. Zummo, XXXX-XXXX, p. 13 (La.4/25/01), 786 So.2d 708, 716 n. 5) (if the jury instructions or interrogatories contain a "plain and fundamental" error, the contemporaneous objections requirement is relaxed and appellate review is permitted). When a jury is erroneously instructed and the error probably contributed to the verdict, an appellate court must set aside the verdict. Nicholas v. Allstate Insurance Company, 99-2522, p. 8 (La.8/30/2000), 765 So.2d 1017, 1023 (citation omitted). In assessing an alleged erroneous jury instruction, the reviewing court must assess such impropriety in light of the entire jury charge to determine if they jury instructions adequately provide the correct principles of law as applied to the issues framed in the pleadings and evidence and whether the instructions adequately guided the jury in its deliberation. Id.
The jury instructions in this case were as follows. First, the trial court gave the generic instructions concerning the responsibility of the jurors, direct and circumstantial evidence, the burden of proof, credibility of the witnesses, and expert witnesses. He then told the jury:
You must determine whether plaintiff, Buffman, Inc. [St. Rita's], has sustained a loss and whether that loss is covered by the policy of insurance issued to plaintiff by defendant, Lafayette Insurance Company/United Fire Group Insurance Company. An insurance policy is a contract between the two parties, Buffman, Inc [St. Rita's], and Lafayette Insurance Company/United Fire Group Insurance Company, and has the effect of law between the parties. Like other contracts, a contract of insurance will generally be enforced according to its terms, and the respective rights and obligations of the parties, both of the insurance company and the policy holder, will be determined by the terms and provisions of the insurance contract. The words of the policy determine the extent of insurance coverage.
The policy at issue here provides coverage for damage or loss caused by wind and excludes damage or loss caused by flood. From the evidence presented, you must make a determination as to which of these, wind or flood, caused a loss. Wind damage is a covered loss in this policy as a "named peril." Flood damage is not a covered loss in this policy. In that context, you should consider the temporal or timing of each event that causes damage or loss. The mere fact that damage or loss occurs by one of the causes, wind or flood, and is later exposed to the other cause is of consequence only to the extent that you decide the damage or loss was caused by one of those perils. Only if you decide that a loss has occurred for which there is coverage by a named peril must you calculate or compute that loss.
When the words of an insurance policy are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent and the agreement must be enforced as written. You should not interpret a provision of the insurance policy standing alone, but rather, you should interpret it in light of the other provisions in the policy so that each provision will be given the meaning that is suggested by the insurance policy as a whole. Words and phrases used in a policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning. Where a policy contains a definition of any word or phrase, its definition is controlling. Further, a broadly worded provision in an insurance policy susceptible of multiple interpretations is ambiguous as a *1038 matter of law and should be interpreted in a manner that supports rather than defeats coverage. Any doubt concerning the limitations on and exclusions from coverage under an insurance policy must be construed against the insurer and in favor of the insured.
In order for there to be a recovery on a policy, the cause designated in the policy must have been the proximate, and not a remote, cause of the loss. Wind must be an efficient cause of loss to recover on a windstorm policy. And where the term "direct" is used, referring to the cause of loss, it means proximate or immediate. Business income insurance compensates the insured for lost earnings that occurred as a result of the interruption of business. Business income insurance protects against the loss of prospective earnings because of the interruption of the insured's business caused by an insured peril to the insured's property.
In the contract of insurance these clauses appear:
Business Income Coverage (and Extra Expense)
A. Coverage
Coverage is provided as described below for one or more of the following options for which a limit of insurance is shown in the Declarations:
(I) Business income including "rental value"
(II) Business income other than "rental value."
(III) "Rental value."
If Option (I) above is selected, the term business income will include "rental value." If Option (III) above is selected, the term business income will mean "rental value" only.
If limits of insurance are shown under more than one of the above options, the provisions of this coverage part apply separately to each.
We will pay for the actual loss of business income you sustain due to the necessary suspension of your "operations" during the "period of restoration."
The suspension must be caused by direct physical loss of or damage to property at the premises described in the declarations, including personal property in the open (or in a vehicle) within 100 feet caused by or resulting from any covered cause or loss.
The policy of insurance issued to Buffman, Inc., provides coverage for loss of business income for a maximum of 120 days or up to $600,000.00, whichever is less. The policy, in part, states:
F(2) Maximum Period of indemnity.
b. The most we win pay for loss of Business Income is the lesser of:
(1) The amount of loss sustained during the 120 days immediately following the damage, or
(2) The Limit of Insurance shown in the Declaration.
1. Business Income.
Business income means the:
a. Net income (net profit or loss before income taxes) that would have been earned or incurred; and
b. Continuing normal operating expenses incurred, including payroll.
2. Covered Causes of Loss.
See applicable causes of loss form as shown in the declarations.
3. Additional Coverages.
a. Extra Expense, in part.
Extra expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a covered cause of loss.

*1039 (1) We will pay any Extra Expense to avoid or minimize the suspension of business and to continue "operations."
(a) At the described premises; or
(b) At replacement premises or at temporary locations, including:
(I) Relocation Expenses; and
(ii) Costs to equip and operate the replacement or temporary locations.
(2) To minimize the suspension of business if you cannot continue "operations."
4. Loss Determination.
a. The amount of business loss will be determined based on:
(1) The net income of the business before the direct physical loss or damage occurred;
(2) The likely net income of the business if no loss or damage occurred;
(3) The operating expenses. Including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical los r O damage; and
(4) Other relevant sources of information, including:
(a) Your financial records and accounting procedures;
(b) Bills, invoices and other vouchers; and
(c) Deeds, liens or contracts.
b. The amount of extra expense will be determined based on:
(1) All expenses that exceed the normal operating expenses that would have been incurred by "operations" during the "period of restoration" if no direct physical loss or damage had occurred. We will deduct from the total of such expenses:
(a) The salvage value that remains of any property bought for temporary use during the "period of restoration," once "operations" are resumed; and
(b) Any extra expense that is paid for by other insurance, except for insurance that is written subject to the same plan, terms, conditions and provisions as this insurance; and
(2) All necessary expenses that reduce the business income loss that otherwise would have been incurred.
"Period of Restoration" means that period of time that:
a. Begins with the date of direct physical loss or damage caused by or resulting from any covered cause of loss at the described premises; and
b. Ends on the date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality.
B. Exclusions (in part).
1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.
g. Water.
(1) Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;
(2) Mudslide or mud flow;
(3) Water that backs up from a sewer or drain; or
(4) Water under the ground surface pressing on, or flowing or seeping through:
(a) Foundations, walls, floors or paved surfaces;

*1040 (b) Basements, whether paved or not; or (c) Doors, windows or other openings.
But if Water, as described in g.(1) through g.(4) above, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage.
B. Exclusions (additional, in part).
2. We will not pay for loss or damage caused by or resulting from any of the following:
d(2) Rust, corrosion, fungus, decay, deterioration, hidden or latent defects, or any quality in property that causes it to destroy itself;
d(7) The following causes of loss to personal property.
(a) Dampness or dryness of atmosphere;
(b) Changes in or extremes of temperature; or
(c) Marring or scratching. But if loss or damage by the "specified causes of loss" or building glass breakage results, we will pay for that resulting loss or damage.
After reciting these policy provisions as part of the jury instructions, the trial court concluded that "Business loss insurance is intended to return to the insured's business the amount of profit it would have earned had there been no interruption of business and allows the business to remain in the same financial condition as before a direct physical loss by an insured of a covered loss or peril" and that "Business income should be determined by adding the amount of net income to the amount of continuing normal operating expenses including payroll, less saved expense." Finally, the trial court recited portions of La. Rev. Stat 22:658 and La. Rev. Stat. 22:1220 to the jury, as well as the portion of the insurance policy pertaining to duties of the policy holder in event of loss or damage.
As noted, the purpose of jury instructions is to present issues and law of the case in the most intelligible form to assure a verdict consistent with the evidence and the law. Accordingly, because interpretation of an insurance contract is a legal question to be determined by the court, it was clearly a plain and fundamental error for the trial court to circumvent its duty by submitting the matter to the jury and thereby allow the jury to resolve legal questions of policy interpretation. While evidence in the case, recitation of large portions of the insurance policy within the body of the jury instructions could only serve to confuse rather than refine the issues or law of the case for the jury. Moreover, the inclusion into the jury instructions of some, but not all, of the policy provisions served to highlight certain provisions and prevent their meaning from being construed in light of the policy as a whole. See La. Civ.Code art. 2050; Peterson, 98-1712 at p. 5, 729 So.2d at 1029; see also Brown v. White, 405 So.2d 555, 558 (La.App. 4 Cir.1981), jdgmt aff'd, 430 So.2d 16 (La. 1982) (the adequacy of jury instructions must be determined in the light of jury instructions as a whole).
Thus, while the trial judge is under no obligation to give any specific jury instructions, he or she is obligated to correctly charge the jury. When a jury is erroneously instructed and it is probable that the error contributed to the verdict, the reviewing court must set aside the verdict. See Nicholas v. Allstate Insurance Company, 99-2522, p. 8 (La.8/31/2000), 765 So.2d 1017, 1023 (the determinative question is whether the jury instructions misled the jury to the extent that it was prevented from dispensing justice). It is with great reluctance that this court ever sets aside a jury verdict, but in this case the trial judge first circumvented his duty to make the appropriate legal determination and then gave the jury instructions *1041 that were, as a whole, confusing and misleading. Accordingly, after considering the instructions as a whole, as well as the circumstances of this case, I can only conclude that jury instructions in this case were so incorrect and misleading as to preclude the jury from reaching a verdict based on the law and facts. Therefore, I would vacate the judgment of the trial court and remand the matter for further proceedings.
NOTES
[1] The amended judgment, rendered on joint motion, provided that interest on the penalties was awarded from the date of judgment, and, on all other items, interest was awarded from date of judicial demand as provided in the earlier judgment. See Sher v. Lafayette Ins. Co., 07-757, pp. 30-32 (La.App. 4 Cir. 11/19/07), 973 So.2d 39, 63. See also La. C.C.P. art. 1921 ("The court shall award interest in the judgment as prayed for or as provided by law.")
[2] According to the Jury Verdict Form, the jury awarded this amount in property damage as an additional amount owed to Buffman, Inc., after "applying the amount of $5,599.60 ($8,999.60 less the $2,500 deductible) already tendered by Lafayette Insurance Company..."
[3] Extra Expense is part of the coverage, and is defined as "Extra Expense means necessary expenses you incur during the `period of restoration' that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss." The jury award of $6,500 was not appealed by e.
[5] So called because it is subject to 26 U.S.C. § 11 and Subchapter C, 26 U.S.C. § 301 et seq. (Internal Revenue Code).
[6] The accountants in their testimony use the term "bonus" far more frequently than "dividend," presumably because in mathematics, the term "dividend" is used to define a part of the process of division; nevertheless, the sum received by a shareholder, such as the Manganos, as profit on their shares, or investment, is treated for tax purposes by the issuance of a K-1 form, for the individual shareholder to submit for paying tax on the bonus/dividend.
[7] These sums were shown as salaries on the monthly statements identified by Mr. Pierce.
[8] The Manganos received W-2's for their salary compensation, $7,500 every two-week pay period. Nevertheless, by accepted accounting principles, the corporation sustained a net loss of $268,000 in 2004, with net sales of $2,900,000.
[9] Mr. Pierce testified that in 2004 the nursing home had gross income of about $2,900,000, and net income before bonuses was about $582,000; the Manganos' 2004 bonus/dividend was $1,045,000. St. Rita's (i.e., Buffman's) profit increase for 2005 before Katrina was about 32 percent (32%), an increase from the 20 percent (20%) profit for 2004; the Manganos' bonus/dividend for 2005 prior to Katrina was about $300,000.
[10] Calogero on this point implicitly overruled the holding in Brinston v. Automotive Casualty Insurance Company, 96-1982 (La.App. 4 Cir. 12/3/97), 703 So.2d 813, 818, which allowed for penalties under both §§ 658 and 1220.
[11] See also La. C.C. art. 2982: "The aleatory contract is a mutual agreement of which the effects, with respect both to the advantages and losses, whether to all the parties or to one or more of them, depend on an uncertain event."
[12] Brinston allowed § 658 penalties on the contractual damages and § 1220 penalties not to exceed $5,000 despite no showing of damages caused by the breach of the duty established in § 1220.
[13] We note parenthetically that Judge Love's opinion in Orellana would have allowed for the imposition of § 1220 penalties far in excess of $5,000 without proof of the sort of damages which Lafayette contends is necessary. See Orellana, supra, 07-1095 at p. 6, 972 So.2d at 1257-1258 (Love, J., concurring in part and dissenting in part).
[14] The trial court's judgment did not calculate the 130% award on the interest due, which is under La. C.C. art. 2000 an item of damages. Buffman did not, however, assign the trial court's calculation as error and we cannot modify the judgment in this respect. See Rule 1-3, Uniform RulesCourt of Appeal.
[1] I do not agree with the majority's assertion that Brinston v. Automotive Cas. Ins. Co. has been "abrogated" by the Supreme Court's decision in Calogero v. Safeway Ins. Co. of Louisiana, 99-1625 (La.1/19/00), 753 So.2d 170. The fact that the Court in Calogero held that penalties for the failure to pay an insurance claim timely could only be assessed under one of the two applicable statutes, La. R.S. 22:658 and 22:1220, rather than under both (as the court in Brinston had done), does not invalidate the Brinston court's interpretation of how penalties are to be determined under either statute. Brinston was not overruled, or even mentioned, in Calogero.
[2] Section B of La. R.S. 22:1220 lists the certain acts which, if committed by an insurer, would constitute a breach of the insurer's duties under the statute. Included in those acts is "(2) Failing to pay a settlement within thirty days after an agreement is reduced to writing."
[3] The trial court rejected an affidavit of Sultana's owner stating he had to use out-of-pocket cash to fund new store construction as being insufficient to establish actual damages. 03-0360, p. 2, 860 So.2d 1115.
[4] Specifically, the jury found that Lafayette had misrepresented policy provisions (22:1220 B(1)) and had arbitrarily, capriciously or without probable cause failed to pay the amount of business income loss due under the policy within sixty days of having received satisfactory proof of loss (22:1220 B(5)).
[5] At the pertinent time, La. R.S. 22:658 B(4), relating only to property damage claims on personal vehicles, provided for a penalty of ten percent of "reasonable expenses incurred" plus reasonable attorney fees for the arbitrary and capricious failure to pay a claim within thirty days "after receipt of adequate written proof and demand therefor."